Lester M. THOMPSON, Secretary, Finance and Administration Cabinet, et al., Appellants,

v.

KENTUCKY REINSURANCE ASSOCIATION, et al., Appellees.

Supreme Court of Kentucky.

May 22, 1986.

Charles D. Wickliffe, Finance & Admin., Frankfort, Henry Watson, III, Tucker, Watson, Weinberg & Frazier, Cynthiana, A. Wallace Grafton, Jr., Sheryl G. Snyder, Virginia H. Snell, William H. Hollander, Wyatt, Tarrant & Combs, Louisville, for appellants.

Joseph L.T. Ardery, C. David Redmon, Susan C. Simpson, Brown, Todd & Heyburn, Louisville, for appellees.

STEPHENS, Chief Justice.

The primary issue we address on this appeal is whether the General Assembly of the Commonwealth may divert funds from the Kentucky Reinsurance Association,[1] a statutorily created Kentucky non-profit corporation, which operates entirely on premiums collected from Kentucky insurance carriers licensed to write Workers Compensation Insurance, Kentucky self-insurance groups, and Kentucky self-insured employers. An ancillary issue is whether the funds so collected must be held and invested by the Kentucky State Treasurer.

The trial court answered both questions in the negative. We affirm.

## BACKGROUND AND PROCEDURAL HISTORY

The 1982 session of the Kentucky General Assembly created the KRA and set out its duties and authority. KRS 342.123, KRS 342.120, and KRS 342.122.[2] The purpose for the creation and operation of KRA is to provide a means for the assumption of the liabilities of the Special Fund. KRS 342.122–.123. This purpose is to be achieved with funds provided by the subscribers mentioned above, who are statutorily mandated to fund any and all liabilities incurred by the KRA in carrying out its purpose. According to a stipulation entered into by the parties, prior to the creation of the KRA the system for funding the claimed obligations of the Special Fund exhibited "several recurring flaws". Presumably, the KRA was created to eliminate these "flaws".

The 1984 regular session of the Kentucky General Assembly enacted its normal biennial budget,[3] which, among other things, authorized and directed the transfer of funds from trust and agency accounts to the General Fund of the Commonwealth. At the same session the General Assembly also enacted legislation[4] which conferred upon itself the authority, in a budget bill, to suspend or modify the operation of an existing statute if such action was required by the financial condition of state government.[5]

In the 1984 budget bill, the General Assembly, acting under the aegis of SB 294 and because of the financial condition of the state, directed the transfer of a substantial percent of the premiums collected by the KRA to the General Fund.[6] In a separate matter the Secretary of Finance and Administration of the Commonwealth, in negotiations with KRA, took the position that all of KRA's funds were state funds, and were therefore required to be held by the State Treasurer and invested by the State Investment Commission. Thus being aggrieved by both matters, the appellees here (plaintiffs below) filed an action in the Franklin Circuit Court, seeking a declaration of rights and injunctive relief.

## DECISION OF THE TRIAL COURT

In deciding through the vehicle of a summary judgment that the KRA had the "rights and responsibilities to control and invest" its premium income, the trial court opined that the General Assembly in enacting KRS 342.122–.123 intended to bring order and predictability to the system of funding the liability of the Special Fund. Since the subscribers are "ultimately liable" for the Special Fund's liabilities insured by KRA, the clear purpose of the

1. Hereinafter referred to as KRA.

2. 1982 Acts of the General Assembly, Ch. 278, secs. 16, 17 and 19.

3. HB 474, Chapter 418 of the 1984 Acts of the General Assembly.

4. SB 294, Chapter 410 of the 1984 Acts of the General Assembly.

5. For a discussion of these two later acts, See, *Commonwealth of Kentucky, ex rel. David L. Armstrong, Attorney General v. Martha Layne Collins,* Governor, 709 S.W.2d 437 (Ky.1986).

6. Part VIII of HB 474 required the KRA to transfer $1,908,000 in 1984–85 and $2,072,000 in 1985–86.

statutes enacting the KRA is to "allow representatives of those subscribers to govern" the funds used to pay them.

The trial court decided that KRA is not a "budget unit" of the Commonwealth of Kentucky, and that the funds it collected from subscribers were private in nature and were not subject to control by the Commonwealth. As a political subdivision of the Commonwealth, KRA is independently responsible for the particular functions prescribed in the laws of its creation.

The trial court also addressed the question of the constitutionality of those 1984 statutory provisions that authorized the General Assembly to transfer funds from KRA to the General Fund. Such provisions were declared invalid for the following reasons: (1) special legislation forbidden by Ky. Const., Sec. 59; (2) violation of the uniformity requirements of Ky. Const., Sec. 171; (3) an unconstitutional "taking" violating Ky. Const., Sec. 13; (4) a violation of the United States Constitution, 14th Amendment; (5) abrogation of a contract between KRA and two agencies of state government, in violation Ky. Const., Sec. 19, and Article I, Section 10 of the U.S. Constitution, and (6) the transfer was "patently inconsistent" with Ky. Const., Sec. 51, concerning the suspension or amendment of laws by the General Assembly.

## CONTENTIONS OF THE PARTIES

Appellant, Frances Jones Mills, contends that the contested Kentucky Statutes do, in fact, require that KRA's funds be deposited with the Kentucky State Treasurer. She argues that KRS 342.122 specifically so directs, and in the alternative, that the general provisions of Kentucky law—KRS 41.070 and KRS 446.010(31)—require state control over such funds. Not surprisingly, appellant Thompson decries the trial court's decisions on all constitutional issues.

## THE QUESTIONED STATUTES

The predecessor of the present Special Fund was created by the General Assembly in 1946 and was called the Subsequent Injury Fund. 1946 Act of the General Assembly, Chapter 23. KRS 342.120, .122 (1946). The act imposed a tax on all insurance carriers insuring Kentucky employers against liability for injury or death suffered by their employees. It also provided that the Subsequent Injury Fund pay compensation due disabled employees for injuries attributable to pre-existing disabilities. The cost was assessed against insureds and self-insureds. KRS 342.122(2) (1946). As time passed, the tax imposed became insufficient to pay the growing number of claims filed against the Subsequent Injury Fund and the 1960 General Assembly added provisions for additional assessments if the tax became insufficient. KRS 342.-122(5) (1960).

The statutes relating to the Subsequent Injury Fund (renamed the Special Fund in 1964), required that all *taxes and assessments* so used were, indeed, to be paid into the state Treasury. KRS 342.122(3), (6).

However, and as previously stated, in 1982 the system in response to "recurring flaws" was dramatically changed. The Kentucky Reinsurance Association was created. The General Assembly established the non-profit, corporate entity to function as a reinsurer of all Special Fund liabilities. No longer does the Special Fund play "catch up" by constantly levying special assessments as money runs out. The KRA, in contrast, collects premiums from all subscribers—in advance—the amount of which is based on actuarial studies.

The KRA is given all "general corporate powers". KRS 342.123(1). It has all the authority and responsibility of a non-profit corporation, including the power to receive, hold and use property, KRS 273.171(4), to make contracts, KRS 273.171(8), and to have and exercise all powers necessary or convenient to effect its purposes KRS 273.-171(17).

In the 1982 enactment the General Assembly did not require the deposit of the premiums collected by KRA into the State Treasury. The KRA is governed by a 15 person board, twelve of whom are elected

by its subscribers. It is attached to the Cabinet for Finance and Administration for "administrative purposes". KRS 342.123.

## IMPLEMENTATION OF THE KRA

Pursuant to KRS 342.122(5)(a), the appellant, Secretary Thompson, in May of 1983 advised KRA that the Special Fund taxes and assessment would be inadequate to pay claims made against the Special Fund and requested KRA to seek reinsurance. No bid was made. Also pursuant to KRS 342.-122(5)(a), appellant Thompson, KRA and the Department of Labor entered into a contract where in essence KRA assumed the liabilities of the Special Fund. The contract authorized KRA to exercise its statutory authority and collect premiums from its subscribers. The contract specifically provided that the KRA would control the investment of those funds. Approximately eleven million dollars was collected.

## ARE THE FUNDS OF KRA PRIVATE OR PUBLIC?

█ While the trial court painted with a broad brush in invalidating the statutes, the heart of the decision dealt with the nature of the funds collected by KRA. Under our view of this appeal, if the funds collected by the KRA are private, as opposed to public, the General Assembly has no authority over them. Moreover, if the General Assembly's action in attempting to divert private funds to public use was invalid, it is not necessary to further address the constitutional issues decided by the trial court.[7]

We concur with the trial court that the premiums assessed by the KRA against its subscribers are clearly *private* funds, as opposed to public, and are therefore not subject to control by the General Assembly. To arrive at this conclusion it is only necessary to identify the nature and pur-

pose of the KRA and to identify its *sole* source of funding.

For years prior to 1982, the Special Fund (and its predecessor) were funded by *taxes* and *assessments.* As we stated, this procedure was flawed and the funding was continually inadequate and untimely. Clearly, a bold, new approach was needed. The KRA resulted. Its sole corporate purpose is to fund all claims and liabilities of the Special Fund. Its sole income is from premiums charged its subscribers—insurance carriers, self-insurance groups, and self-insured employees. The amount of the premiums is to be determined—actuarially—to be that amount of dollars necessary to fund the Special Fund—*whatever the amount.* If the premiums and premium increases are insufficient to meet those needs, the amount of premiums is pro forma increased. The funding source of KRA is solely and exclusively from private sources.

In the instant case, in HB 474 (the budget bill) the General Assembly transferred $3,980,000 dollars in the 1984–1986 biennium from the *premiums* collected by KRA to the General Fund, to be used, not for meeting the liabilities of the Special Fund, but for general administration of state government. This amount so expropriated and diverted was nearly 30% of the KRA's actuarially determined funds. It goes without saying that KRA will thus come up short in its financial obligation to the Special Fund by at least this amount, and will *ergo*, charge that additional sum to its subscribers to meet its obligations. This is clearly an improper use of private funds.[8]

In *Ross v. Gross,* 300 Ky. 337, 188 S.W.2d 475 (1945), certain county officials paid fees which they had collected into the State Treasury. A certain percentage of those fees was specifically allocated to pay

---

7. We have already decided the Ky. Const, Sec. 51 issue in a case which is contemporaneous with this one. See, *Commonwealth of Kentucky ex rel. David L. Armstrong, Attorney General v. Martha Layne Collins,* Governor, 709 S.W.2d 437 (Ky.1986) in which we declared HB 474 and SB 294 both valid in respect to Ky. Const., Sec. 51.

8. See, *Commonwealth of Kentucky, ex rel. David L. Armstrong, Attorney General v. Martha Layne Collins,* Governor, 709 S.W.2d 437, 446 *et seq.*

the officials' salaries and expenses and this court determined that a portion of those funds paid into the State Treasury was to be refunded to the officials, based on the population of their resident counties. The Commonwealth claimed that the funds once deposited then became public money and were then under the control of the General Assembly. Disagreeing, this court held that:

> "[S]ince the money belonged to the appellees or the County, its payment into the State Treasury did not vest the State with title thereto or a right to its custody." *Id.* at 477.

We find the holding of *Ross* to be analogous to the nature of the premiums paid to KRA. We also concur with the reasoning of the Utah Supreme Court in *Gronning v. Smart,* 561 P.2d 690 (1977), wherein the state legislature attempted to divert money from the State Insurance Fund, a fund which compensates injured employees, to a state agency which enforced various state safety laws. That court said:

> "The money in the Fund is not public money subject to appropriation to meet expenses of government. It is a trust fund to be used to meet liabilities of employees when an employee is entitled to compensation." *Id.* at 692.

The funds of KRA are private funds provided by the corporate subscribers and are to be used for one purpose—one purpose only—*viz,* to pay for the liabilities of the Special Fund. We therefore conclude that the provisions of the 1984 budget bill that direct such a transfer are improper.

### DOES KRA HAVE AUTHORITY OVER DEPOSIT AND INVESTMENT OF ITS FUNDS?

Appellants argue that KRS 446.010's definition of "state funds" includes the premiums collected by KRA and that KRS 41.070(1) requires all such funds to be deposited in the State Treasury. Certainly, the impact of those two statutes is to require *state funds* to be so deposited. However, as we previously stated the premiums collected by KRA are *not state funds* —they are *private funds*. Since both statutes are applicable only to state funds, appellants argument is without merit.

It is clear that the General Assembly in creating the KRA was seeking a new way—an innovation—to solve an old and recurring problem. It created an independent state agency with its own independent, corporate authority. It was created for one purpose and its funding is achieved without tax dollars, without public money. The method of operation is to collect premiums—in advance of liabilities—to invest these funds, so that much of the liability can be met by investment income. This is clearly a function of the board of directors of the corporation and the omission of it by the General Assembly cannot be assumed to be accidental. All other statutory provisions are consistent with this view and we so hold.

The decision of the trial court is affirmed.

All concur.