Ervin KLEIN, et al., Appellants

v.

Lori Hudson FLANERY, In Her Official Capacity As the Secretary of the Finance and Administration Cabinet, et al., Appellees

and

Louisville Soccer Alliance, Inc., et al., Appellants

v.

Steven L. Beshear, In His Official Capacity As The Governor Of Kentucky, et al., Appellees.

Nos. 2012–SC–000071–DG, 2012–SC–000197–DG.

Supreme Court of Kentucky.

June 19, 2014.

As Modified Sept. 26, 2014.

Mark David Guilfoyle, H. Edward O'Daniel, Jr., Thomas James Banaszynski, Oliver H. Barber, Jr., for Appellants.

Mark Stephen Pitt, Christopher Wilson Brooker, for Appellees.

Opinion of the Court by Justice ABRAMSON.

The 2008–2010 biennial budget bill (HB 406, 2008 Ky. Acts, ch. 127) provided, among many other things, for the transfer to the state's General Fund of more than $10 million from various funds created

within the Department of Housing, Buildings and Construction (HBC) and the transfer of $700,000 from the fund dedicated to the Department of Charitable Gaming (DCG). Both HBC and DCG are agencies within the Public Protection Cabinet. In separate actions brought before the Franklin Circuit Court, licensed building contractors Ervin Klein, Thomas Rechtin, Eddie Noel, and David Miles (collectively "Klein" or the "*Klein* appellants"), and licensed non-profit organizations Louisville Soccer Alliance, Inc., and the Catholic Conference of Kentucky (collectively "Soccer Alliance" or the "*Soccer Alliance* appellants")[1] sought declarations to the effect that the respective transfers violated various provisions of the Kentucky Constitution. They also sought injunctive relief prohibiting the transfers and, in Soccer Alliance's case, injunctive relief compelling the refund of allegedly unlawful licensing fees. Both plaintiff groups sued the Secretary of the Finance and Administration Cabinet and the State Budget Director in their respective official capacities. Additionally, Klein named the Commissioner of the Department of Housing, Buildings and Construction, and Soccer Alliance named the Governor, the State Treasurer, and the Secretary of the Public Protection Cabinet. For purposes of this Opinion, we refer to the defendants in both cases as the "Commonwealth."

Both cases were resolved by summary judgment. In *Klein* the trial court ruled that the 2008–2010 budget bill's transfer of agency funds to the General Fund was lawful and thus dismissed Klein's claims, but in *Soccer Alliance* the trial court held that the transfer in effect transformed a lawful regulatory fee into an unlawful tax, a tax violative of sections 51 and 180 of the Kentucky Constitution. Separate panels of the Court of Appeals affirmed the result in *Klein* and reversed in *Soccer Alliance.* Both panels held that the challenged transfers did not run afoul of the asserted constitutional restrictions on the General Assembly's authority to tax and to regulate. We granted motions for discretionary review in both cases to consider Klein's and Soccer Alliance's contentions that the fund transfers amount to a surreptitious tax. Because the two cases raise similar issues, we have consolidated them for consideration in this single opinion, and for reasons addressed herein we affirm.

## RELEVANT FACTS

With H.B. 44 (1978 Ky. Acts, ch. 117), the 1978 General Assembly created "a department of buildings, housing and construction." The Department's organization and duties are provided for in Kentucky Revised Statutes (KRS) Chapter 198B. The Department was tasked at its inception with the promulgation of "a mandatory uniform state building code," and has since then been responsible for revising the code and enforcing it. The enforcement regime includes the licensing of building contractors, such as the *Klein* appellants, and the oversight, through permits and inspections, of building construction and the installation of such major building components as plumbing systems; electrical systems; heating, ventilation, and air conditioning systems; and fire protection sprinkler systems. At least a dozen funds have been created within the Department dedicated to different aspects of its mission, the source of virtually all of which

---

1. Joining the Soccer Alliance and the Catholic Conference as plaintiffs were several affiliated individuals and organizations: Michael Hayes; Louisville Soccer Club, Inc.; Douglas Lanham; Kentucky Soccer Association, Inc.; Rebecca Nalley; Edward C. Monohan; Holy Name of Jesus Parish; and Rev. J. Edward Bradley.

are the licensing, permit, and inspection, fees the various subagencies collect as well as fines imposed for building code violations. *See, e.g.,* KRS 198B.095 (authorizing a building inspectors training program and an associated Building Inspectors' Financial Incentive Training Program fund); KRS 198B.650–198B.689 (creating a program for the licensing of heating, ventilation, and air conditioning contractors, including the creation of an associated trust and agency account, the monies of which "shall be used only for the administration and enforcement of KRS 198B.650 to 198B.689").

Following the 1992 constitutional amendment legalizing charitable gaming in Kentucky (Ky. Const. § 226), the 1994 General Assembly created the Division (now Department) of Charitable Gaming to oversee such gaming and to ensure that it serves legitimately charitable purposes and not commercial or illegal ones. 1994 Ky. Acts, ch. 66 (H.B.206), now codified at KRS 238.500–238.995. The Department carries out its duties largely through a system of licenses, inspections, and audits, and its activities are funded through the "charitable gaming regulatory account," the sources of which include fines imposed by the Department and a fee imposed on all charitable gaming, including that carried on by the *Soccer Alliance* appellants. The fee is a percentage of gross receipts from charitable gaming in Kentucky, with the percentage to be periodically adjusted so that the amounts collected by the Department stay roughly in line with its necessary expenses. KRS 238.570.

The two cases now before us involving these agencies have their genesis in then newly-elected Governor Beshear's January 2008 Executive Order (08–011) requiring the state's executive offices and agencies "to immediately reduce costs" in an effort to address what the Governor referred to as "a projected General Fund budget shortfall" of hundreds of millions of dollars. The Executive Order purported to revise certain appropriations to the state's executive agencies to amounts less than had been appropriated by the General Assembly for the 2007–2008 fiscal year, and in that way to reduce General Fund expenses. And in order to increase General Fund income, the Order also transferred to the General Fund certain amounts from specified agency accounts not financed through the General Fund. Pursuant to the Executive Order, $700,000 was thus transferred from DCG's regulatory account, and a total of $6,495,200 was transferred from a dozen funds within HBC.

Not long thereafter the General Assembly enacted the 2008–2010 biennial budget,[2] which ratified the Governor's Order as follows:

> Notwithstanding KRS 48.130 and 48.600 [statutes providing for budget reductions in the event of revenue shortfalls], the General Assembly adopts and enacts the revised General Fund appropriation levels for the budget units of the Executive Branch identified in General Fund Budget Reduction Order 08–01 and enacts the transfers to the General Fund of non-General Fund moneys identified in General Fund Budget Reduction Order 08–01.

2008 Ky. Acts, ch. 127, Part III, General Provisions, 29. House Bill 406 also provided that "[n]otwithstanding the statutes or requirements of the Restricted Funds enumerated below," certain additional amounts were to be transferred from vari-

---

**2.** The Governor vetoed a small portion of the bill, but signed the remainder into law on April 18, 2008.

ous Restricted Funds to the General Fund, including from specified accounts within HBC $600,000 for fiscal year 2007–2008; $1,300,000 for fiscal year 2008–2009; and $1,800,000 for fiscal year 2009–2010, bringing the total amount to be transferred from HBC to $10,195,200. 2008 Ky. Acts, ch. 127, Part V, Funds Transfer, preamble and E. 10.

The *Klein* appellants brought their suit challenging the HBC transfers on June 25, 2008, and the *Soccer Alliance* appellants filed their challenge to the DCG transfer on July 23, 2008. In broad terms, both sets of appellants contend that regulatory fees, such as those the agencies collected here, may only be used by the collecting agency for regulatory purposes and that their transfer, in any amount, to the General Fund for general revenue purposes has the effect of converting them, at least to the extent of the transfer, to taxes, taxes that violate both procedural prerequisites and substantive limitations imposed by our Constitution. The Commonwealth concedes a basic distinction between regulatory fees and taxes and agrees that in general such fees may only be used for the regulatory purposes for which they were collected, but it maintains that no constitutional violation occurs when fees incidentally collected in excess of the agency's regulatory expenses are transferred to the General Fund. In the Commonwealth's view, transfer of such incidental excesses, or surpluses, is all that took place in these cases, and thus, it contends that the challenged transfers did not amount to taxes and were lawful.

The two Court of Appeals panels that reviewed these cases agreed with the Commonwealth. The *Klein* panel opined that because "the primary purpose of the legislation imposing the fees paid to the HBC is to regulate the trades governed by the HBC ... even if the transfer to the General Fund produced a revenue for the public, it does not become a tax." Similarly, reversing the trial court's judgment in *Soccer Alliance*, another panel held that "there is no indication that the [DCG] fee is intended to generate excess revenue for the state. Simply because the revenue exceeded the expenditures in 2008 does not support the trial court's determination that the regulatory fee was somehow converted into an unconstitutional tax." Klein and Soccer Alliance take issue with those conclusions on a number of grounds, each of which we address in turn.

### *ANALYSIS*

**I. Transfer to the General Fund of Regulatory Agency Surpluses Does Not Violate Section 180 of the Kentucky Constitution.**

This is by no means, of course, the first time that budget-balancing measures adopted by the General Assembly have caused Kentucky citizens to cry "foul." The outrage often concerns what is perceived to be the General Assembly's apparent disregard of its own statutorily expressed commitments. The statutory provisions are often of two types, purpose provisions and anti-lapse provisions,[3] and may be illustrated by some of the statutes at issue here. KRS 238.510, for example, creates the Department of Charitable Gaming and establishes its purposes:

> The Department of Charitable Gaming is created as a department within the Public Protection Cabinet. The Department shall license and regulate the con-

---

**3.** As a general rule monies from the prior fiscal year left in agency accounts after expiration of thirty days from the beginning of the current fiscal year "lapse to the surplus ac- count of the general fund or road fund." KRS 45.229(2). The General Assembly, of course, may, and often does, provide for "anti-lapse" exceptions to this general rule.

duct of charitable gaming and license and regulate charitable organizations that desire to engage in charitable gaming, charitable gaming facilities, manufacturers, and distributors in the Commonwealth of Kentucky, in accordance with the provisions of this chapter.

KRS 238.510(1). Among the Department's powers and duties are the "licensing [of] charitable organizations [and] charitable gaming facilities," the "[p]rescribing [of] reasonable fees for licenses," and the "[c]ollecting and depositing [of] all fees and fines in the charitable gaming regulatory account and administering the account." KRS 238.515(1), (3), and (7). To which end, KRS 238.570(2) provides that

[t]he charitable gaming regulatory account is hereby created as a revolving account within the agency revenue fund and under the control of the Public Protection Cabinet. All revenues generated from the fee levied in subsection (1) of this section[,] from license fees and from administrative fines imposed by the department shall be deposited in this account. Fund amounts attributable to the fee levied in subsection (1) of this section that are not expended at the close of a fiscal year shall not lapse but shall be carried forward to the next fiscal year.

The statutes thus define a regulatory purpose, dedicate certain revenue sources to that purpose, and provide that some, at least, of the monies collected from those sources shall not lapse at the close of a fiscal year.

As another example, KRS 198B.650 to 198B.689 create the Kentucky Board of Heating, Ventilation, and Air Conditioning Contractors, KRS 198B.652; establish its powers and duties, including the licensing of master and journeyman contractors, KRS 198B.650, KRS 198B.654; and authorize the collection of licensing and inspection fees in a reasonable amount "not to exceed the actual costs for the administration of the program." KRS 198B.6673. KRS 198B.6674 provides that

[a]ll fees and fines collected [pursuant to the HVAC provisions] and paid into the State Treasury shall be credited to a revolving trust and agency account and shall be used only for the administration and enforcement of KRS 198B.650 to 198B.689 and the repayment of moneys borrowed from surplus trust and agency accounts of the department [of Housing, Building and Construction]. The moneys in the account are hereby appropriated by the General Assembly for the purposes set forth in KRS 198B.650 to 198B.689, and shall not lapse at the close of the fiscal year.

Here again, then, specified sources of revenue are dedicated to a particular regulatory purpose, and at the close of the fiscal year unexpended monies collected from those sources do not lapse to the General Fund, but are to remain in the agency's account.

When, as in the cases now before us, the General Assembly provides in a budget bill for the transfer of funds from agency accounts such as these to the General Fund, its authority to do so may be reasonably questioned on a couple of grounds. On the one hand, the transfer might be seen as an improper repurposing of statutorily dedicated funds, and on the other hand the transfer might be viewed as a violation of the statutory anti-lapse provisions.

Without distinguishing these separate grounds of complaint, in *Armstrong v. Collins,* 709 S.W.2d 437 (Ky.1986), this Court noted the General Assembly's broad authority to amend legislation and its express authority under Section 15 of the Kentucky Constitution to suspend it, and in light thereof, with one notable exception, the Court upheld several transfers

from restricted agency funds to the General Fund-transfers like the transfers at issue here. Not surprisingly, the Commonwealth maintains that *Armstrong* is thus dispositive of Klein's and Soccer Alliance's claims.

In *Armstrong*, the fund transfers were challenged as violative of Section 51 of the Kentucky Constitution, which section requires that laws enacted by the General Assembly relate to a single subject, that that subject be reflected in the title, and that amended statutes be reenacted. The budget-bill fund transfers did not run afoul of those requirements, the Court held, because they effected only temporary suspensions of the pertinent statutes, not amendments of them, and because the transfer of funds from one purpose to another was an "appropriation[ ], in the broad sense," *id.* at 444, and thus came within the subject and title of an appropriations bill.

Klein and Soccer Alliance acknowledge *Armstrong*, but because their claims are not based, at least not primarily, on Section 51, they insist that *Armstrong* provides little guidance. Their claims, rather, are based on a reading together of Section 180 of the Kentucky Constitution and a line of cases decided by our predecessor Court, a line extending from *City of Henderson v. Lockett*, 157 Ky. 366, 163 S.W. 199 (1914).[4] Section 180 provides that

> every act enacted by the General Assembly, and every ordinance and resolution passed by any county, city, town or municipal board or local legislative body, levying a tax, shall specify distinctly the

purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose.

In *City of Henderson v. Lockett*, our predecessor Court addressed a claim that a city's newly imposed license fee on automobiles amounted to an unconstitutional form of taxation. The Court upheld the ordinance on the ground that it did not impose a tax, but rather a regulatory fee. In the course of doing so, the Court deemed the regulation of automobiles a legitimate exercise of the city's police power, but cautioned that

> where a license fee is imposed under the police power, the fee exacted must not be so large as to charge the ordinance with the imputation of a revenue-producing purpose. The fee that may be imposed under the police power is one that is sufficient only to compensate the municipality for issuing the license and for exercising a supervisory regulation over the subjects thereof. Anything in addition to this amounts to a tax for revenue, and cannot be upheld as a valid exercise of the police power.

163 S.W. at 201.

 Thus, according to Klein and Soccer Alliance, Section 180 and *City of Henderson* pose a dilemma. If, on the one hand, the monies collected from them are deemed taxes, Section 180 forbids their being transferred in any amount to the General Fund and "devoted to another purpose."[5] On the other hand, if the monies were collected from them as regulatory fees, then any "surplus" portion of them

---

4. *See, e.g., Reeves v. Adam Hat Stores*, 303 Ky. 633, 198 S.W.2d 789 (1946); *Martin v. Greenville*, 312 Ky. 292, 227 S.W.2d 435 (1950); *Roe v. Commonwealth*, 405 S.W.2d 25 (Ky. 1966).

5. As we noted in *Beshear v. Haydon Bridge Company ("Haydon Bridge I")*, 304 S.W.3d 682, 706 (Ky.2010), "To determine the purpose for which the tax was levied, we must look to the act levying the tax," not to a subsequent appropriations act.

transferred to the General Fund would "amount[ ] to a tax for revenue," *City of Henderson*, 163 S.W. at 201, a tax not validly imposed by the regulatory statutes pursuant to which they were collected.[6] In either case, argue Klein and Soccer Alliance, the budget-bill transfers to the General Fund of dedicated regulatory monies is unlawful.

Although far from meritless, we are convinced that Klein and Soccer Alliance's reading of Section 180 and *City of Henderson* is too narrow and mechanical. Under their reading, the General Assembly could never provide for the lapsing of a dedicated fund's year-end surplus to the General Fund, but the law has long been to the contrary. Indeed, before Section 180 was a decade old, the former Court of Appeals held that where surpluses of "tax levies for various county purposes" had accumulated over a few years, Bracken County could use the surpluses "[f]or the purpose of building a much-needed court house." *Field v. Stroube*, 103 Ky. 114, 44 S.W. 363 (1898). When it was urged that under Section 180 the surplus taxes could not be diverted from their original pur-

poses, the Court explained that, "when the object to be attained by the levy has been accomplished, and a surplus remains, it must be treated as a part of the general funds of the county and available for general county purposes." *Id.*

Reiterating this idea a few years later, the Court elaborated as follows:

> We held [in *Stroube* ] that, where a surplus remains after the object to be obtained by a particular levy has been accomplished, such a surplus might be appropriated by the county, even for general purposes, and that such appropriation was not prohibited by section 180 of the Constitution. Such a construction is necessary, because it is impossible to fix accurately a tax rate to meet exactly a liability. Exonerations, delinquencies, or miscalculation, decrease or increase of valuation by supervisors or boards of equalization, and other unforeseen circumstances, will, in every probability, produce either a surplus or deficit of tax: and, if a surplus, to hold that it could never be used for any purpose, except that for which it was specifically levied, would tend to, in

---

**6.** In a broad sense, perhaps, any monetary exaction by a governmental entity could be thought a tax, but a "tax" in the strict sense of monies levied to meet the general expenses of government has been distinguished in a variety of contexts from more particularized exactions, such as fines, user fees—tolls, for example—infrastructure assessments, or regulatory fees, such as those at issue here. In making the distinction, courts often sketch "a spectrum with a paradigmatic tax at one end and a paradigmatic [fine or] fee [or assessment] at the other." *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st. Cir.1992) (citations omitted). They then attempt to locate the exaction at issue along the spectrum. The classic "tax" is "imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community.... The classic 'regulatory fee' is imposed by an agency upon those sub-

ject to its regulation.... It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive.... Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses." *Id.* All taxes, as the Supreme Court has observed, have regulatory effects. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, — U.S. —, 132 S.Ct. 2566, 2596, 183 L.Ed.2d 450 (2012) ("Indeed, 'every tax is in some measure regulatory.' "). All regulatory fees, likewise, support, to some extent, the general purposes of the government. The exactions at issue in these cases clearly begin, at least, as regulatory fees rather than taxes, and as discussed in the text, do not cease to be fees and become taxes unless and until the amount exacted becomes disproportionate to the amount expended for regulatory purposes.

time, lay up a public fund entirely unavailable for any public purpose. A construction leading to such an absurd result will be repudiated as not having been within the contemplation of the framers of the Constitution.

*Whaley v. Commonwealth,* 110 Ky. 154, 61 S.W. 35, 38–39 (1901). Since *Stroube* and *Whaley,* the rule that the Commonwealth (and other taxing authorities) are not precluded by Section 180 from using surplus dedicated taxes for General Fund purposes has remained so well settled as to appear only infrequently and tangentially in our cases. *See, e.g., Nichols v. Henry,* 301 Ky. 434, 191 S.W.2d 930 (1945); *Fannin v. Davis,* 385 S.W.2d 321 (Ky.1964).

For the same reason—the impossibility for any given fiscal period of precisely matching income and expense—the lapse of surplus regulatory fees to the General Fund does not transform the fee into an unlawful tax.[7] *Cf. San Juan Cellular Tel. Co. v. Pub.Serv. Comm'n of Puerto Rico,* 967 F.2d 683 (1st Cir.1992) (distinguishing tax from regulatory fee for the purposes of the federal Tax Injunction Act, 28 U.S.C. § 1341, and holding that lapse provision did not convert fee to tax); *United States v. Munoz–Flores,* 495 U.S. 385, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990) (holding, under the Origination Clause, U.S. Const., Art. I, § 7, cl. 1, that a regulatory statute did not become a revenue bill merely because the regulatory fee resulted in "incidental" revenue lapsing to the general Treasury). *City of Henderson* and its progeny require only that the fee collected bear a reasonable relation to the regulatory expense. In *Reeves,* 198 S.W.2d at 789, for example, a case upon which the *Klein* appellants particularly rely, the amount collected pursuant to the measure at issue was over sixty times the cost of administering the purported regulation. Our predecessor Court held that such a gross imbalance required treating the measure as a tax and not as a regulatory fee. Absent some such clear showing that the amount exacted is not reasonably related to regulatory costs, however, our cases have upheld the regulatory measures. *See, e.g., Daily v. Owensboro,* 257 Ky. 281, 77 S.W.2d 939 (1934); *Mayfield v. Carter Hardware Company,* 191 Ky. 364, 230 S.W. 298 (1921).

In *City of Henderson* itself, the Court reversed the trial court's invalidation of the fee, because the plaintiffs had made no showing that the amount of the fee was unreasonable for its stated purpose. Where the amount exacted does not exceed what is reasonably necessary for regulatory purposes, the fact that, in a given fiscal period, the amount actually collected turns out to be somewhat more than the amount actually expended, with the excess

---

**7.** The dissent maintains that it makes no sense to speak of "surplus" regulatory fees when the purpose for which the fees were collected remains ongoing. In fact, however, because in most instances one session of the General Assembly cannot bind its successors, its purpose in authorizing and appropriating regulatory fees cannot be "ongoing" as the dissent understands it. Its purpose, rather, is simply to fund the given regulatory program for the given fiscal period, and if unexpended funds remain at the end of the period it is no departure from ordinary usage to regard the leftover funds as "surplus." The next session of the General Assembly may, of course, elect to continue and to re-fund the regulatory program, but its devotion to that purpose of its predecessor's surplus (assuming the surplus was not so excessive as to belie a regulatory and imply a revenue-raising intent) is not constitutionally compelled under our precedents but instead remains a matter of legislative discretion adequately and appropriately checked by the political process. *See Whaley v. Commonwealth,* 61 S.W. at 35 (recognizing the possibility of surplus highway taxes-notwithstanding that road maintenance is certainly one of the quintessentially "ongoing" government expenses).

lapsing to the General Fund, does not, without more, convert a valid fee into an invalid tax. Under neither Section 180 nor *City of Henderson*, in sum, is the Commonwealth precluded from transferring to the General Fund surplus amounts from restricted regulatory agency funds such as the HBC and DCG funds at issue here.

Even if there were such a rule—and as noted we conclude there is—permitting the transfer of fund surpluses to the General Fund, both Klein and Soccer Alliance contend that the rule does not apply here, because the amounts transferred from their funds were not genuinely "surplus." Essentially, their claims are that in the years leading up to the challenged transfers, regulatory fees were increased while the agencies' belts were being tightened. The "surpluses" thereby generated and swept into the General Fund, Klein and Soccer Alliance maintain, thus have everything to do with revenue raising and little to do with regulation, contrary to both Section 180 and *City of Henderson*.

■■■ We are not unsympathetic to these legitimate concerns. While the General Assembly "must be empowered to use adequate devices to balance the budget," *Armstrong*, 709 S.W.2d at 443, that empowerment does not extend to sidestepping the Constitution by transforming non-revenue levies into unenacted taxes. *Cf. Clean Water Coal. v. The M Resort, LLC*, 255 P.3d 247 (Nev.2011) (holding that the transfer of $62 million from a Las–Vegas–area interlocal water management coalition to the state's general fund converted a valid local utility assessment into an unconstitutional special tax); *Hawaii Insurers Council v. Lingle*, 120 Hawai'i 51, 201 P.3d 564 (2008) (holding that the transfer

of regulatory fees from agency fund to general fund converted fees to taxes in violation of the separation of powers doctrine); *Alliance of Am. Insurers v. Chu*, 77 N.Y.2d 573, 569 N.Y.S.2d 364, 571 N.E.2d 672 (1991) (invalidating transfer from state-controlled secondary insurance fund to general fund and noting that the transfer had, in effect, converted mandatory contributions to the fund to general revenue taxes). As noted above, however, the burden of establishing that a regulatory fee does not bear a reasonable relationship to the cost of administering the regulatory program is on the party challenging the fee. We agree with the Court of Appeals panels that neither Klein nor Soccer Alliance has met that burden.

The *Klein* appellants, indeed, have not even specified which fee, or fees, they seek to challenge. As noted above, H.B. 406 provides for the transfer to the General Fund of monies held in several distinct funds maintained within HBC. The *Klein* appellants themselves point to the disparate treatment of the different funds, with, for example, only a nominal transfer of $100 from the fund devoted to fire protection sprinkler systems, but a transfer of $2.75 million from a fund or funds devoted to the regulation of electrical systems. The validity of the individual transfers depends on the unique set of statutory provisions establishing and governing each fund as well as on the specific amounts within and transferred from the individual accounts. The *Klein* appellants' generic attack on the transfers as a whole simply does not provide an adequately detailed basis for assessing the validity of any of the HBC transfers.[8]

---

8. For example, the *Klein* appellants assert that "$10,195,200.00 in HBC fees were transferred beginning in FY 2008–09 when the entire restricted fund budget for HBC operations was $15,826,400.00.... That amounts to a 64% sweep of HBC fees." But this assertion grossly misrepresents the record, such as it is. As noted above, in January of

Soccer Alliance, likewise, has failed to allege facts establishing a disconnect between the amount of the fees collected by DCG and the cost of its regulatory mission. On the contrary, as Soccer Alliance concedes, the principal fee underwriting DCG's operation is provided for in KRS 238.570. Since June 2007, that section has provided in pertinent part as follows:

(1) A fee is imposed on charitable gaming in the amount of fifty-three hundredths of one percent (0.53%) of gross receipts derived from all charitable gaming conducted by charitable organizations required to be licensed in the Commonwealth of Kentucky. The amount of the fee shall be adjusted by October 1 of each odd-numbered year in accordance with subsection (3) of this section.

\* \* \* \* \* \*

(3)(a) No later than July 31 of each odd-numbered year, the Public Protection Cabinet shall determine:

1. The amount of gross receipts during the prior biennium against which the fee collected under subsection (1) of this section was assessed, and

2. The final budgeted amount as determined by the enacted budget for the upcoming biennium for the administration and enforcement of the provisions of

this chapter. If a budget is not enacted, the amount shall be the corresponding amount in the last enacted budget.

(b) On October 1 of each odd-numbered year, the fee assessed under subsection (1) of this section shall be proportionally adjusted by the Public Protection Cabinet. The new rate shall be calculated by multiplying one hundred ten percent (110%) by the amount determined in paragraph (a)2. of this subsection, and subtracting from that amount one-half (1/2) of any remaining balance in the account. The total shall then be divided by the amount determined in paragraph (a)1. of this subsection. The result shall be expressed as a percentage and shall be rounded to the nearest thousandth of a percent (0.000%).

The statutory formula thus seeks to ensure that the amount collected during the current biennium will match the amount budgeted for that period, with a slight hedge against the possibility that, compared with the prior biennium, charitable gaming receipts during the current biennium will decrease. While it might be that the hedge creates a likelihood that the fee will generate a small surplus, at the time of Soccer Alliance's suit the statutory for-

---

the 2007–2008 fiscal year, the Governor initially ordered that some $6.5 million be transferred from a number of HBC accounts to the General Fund. Since the *Klein* appellants have provided no data concerning the state of the particular accounts at the time of the Order, the record does not indicate whether these initial transfers were made from current fiscal-year receipts or from surpluses accumulated over a number of prior fiscal years, but the latter is by far the more likely scenario. In H.B. 406, the General Assembly adopted the Governor's transfers and ordered that an additional $600,000 be transferred in fiscal year 2007–2008 from various HBC accounts to the General Fund. Again, the appellants' failure to provide detailed accounting data

makes it impossible to know exactly how the $600,000 should be characterized, but the indication is that it was additional surplus created by the Governor's cost-cutting measures. In H.B. 406 the General Assembly also authorized the transfer from HBC of $1.3 million in fiscal year 2008–2009 and $1.8 million in fiscal year 2009–2010. Those transfers, according to the Commonwealth, were contingent on there being sufficient surpluses in the specified fiscal years to cover them. Be that as it may, these additional transfers from future fiscal years together with transfers from who knows how many prior fiscal years plainly do not constitute anything like a "64% sweep" of fiscal year 2008–2009 HBC receipts.

mula had not been in effect long enough to tell.

Immediately prior its 2007 amendment, KRS 238.570 provided that

[m]oneys in this account shall be expended by the [office] only in the administration and enforcement of provisions of this chapter. No later than July of each odd-numbered year, the [office] shall assess the amount of funds raised by all fees levied in this chapter and shall make recommendations to the Legislative Research Commission concerning legislative amendments to adjust fee rates as indicated by the assessment.

1994 Ky. Acts ch. 66 § 15(2). This provision, too, was clearly meant to ensure that the fees collected would correspond to the agency's expenses. The summary the *Soccer Alliance* appellants have provided of the fee's performance up until 2007, assuming the summary's accuracy, makes clear that under the old approach surpluses were not a matter of course—there were years when the fees generated did not cover the budget—and that the surpluses that were generated were not in amounts so disproportionate to the agency's expenditures as to suggest a revenue-raising intent.

As summarized by Soccer Alliance, the surpluses have ranged from less than $200,000 to about $800,000, with a mean in the neighborhood of $500,000, compared to annual expenditures of roughly $2.8 million—a surplus of less than 20% of expenditures, a far cry from the 6000% "surpluses" deemed invalid in *Reeves*. According to the *Soccer Alliance* appellants, no transfers were made to the General Fund in fiscal years 2001 to 2004. In 2005 the General Assembly transferred $191,200 from the DCG surplus to the General Fund; in 2006 it transferred $1,100,000; and in 2008, after the General Assembly adopted the new formula for determining

the fee, it transferred the $700,000 at issue here. We agree with the Court of Appeals panel that these amounts—about $2,000,000 over a period of eight years—are not such as to suggest that the statutorily determined fee is intended to generate excess revenue for the state, as opposed to protecting the agency from income fluctuations. We conclude, therefore, that the $700,000 transfer provided for in H.B. 406 comes within the general rule permitting the transfer of surplus agency funds to the General Fund.

## II. The Challenged Transfers to the General Fund Did Not Invade "Private Funds."

Even if the challenged transfers do not run afoul of Section 180 and *City of Henderson*, they are still unlawful, the *Klein* and *Soccer Alliance* appellants maintain, because they are contrary to that portion of *Armstrong* disallowing the budget-bill transfer to the General Fund of what the *Armstrong* Court referred to as "private funds." In *Armstrong*, as previously noted, the plaintiffs maintained that transfers provided for in a budget bill from various special or restricted funds to the General Fund violated Section 51's requirements that Acts of the General Assembly have a single subject reflected in the title and that amended statutes be reenacted. The Court upheld for the most part the challenged transfers, because the budget bill did not amend but only suspended statutes barring the transfers and because the transfers were enough like appropriations to come within the subject and title of an appropriations bill. The Court excepted from its general holding, however, what it referred to as transfers from "private funds:"

[T]he transfers of funds which relate to appropriations of private contributions cannot be termed suspensions or modifi-

cations of the operation of the statutes. Because the General Assembly has no authority to transfer private funds to the general fund, the transfer of money from agencies in which public funds and private employee contributions are commingled, and cannot be differentiated, is unconstitutional. Diversions from the Kentucky Employees Retirement System, County Employees Retirement System, State Police Retirement System, and Teachers' Retirement System fall within this category, as do Workers' Compensation and Workers' Claims Special Fund. The employee contributions and the insurance company assessments constitute private, mandatory donations.

*Armstrong,* 709 S.W.2d at 446–47. Accordingly, the Court invalidated the budget bill before it "[t]o the extent that private funds were transferred." *Id.*

Soon after *Armstrong,* the Court reiterated its "private fund" holding in *Thompson v. Kentucky Reinsurance Ass'n,* 710 S.W.2d 854 (Ky.1986). *Thompson* addressed a challenge to the wholesale transfer to the General Fund of monies held in a recently created workers' compensation secondary insurance fund called the Kentucky Reinsurance Association (KRA). Upholding the trial court's invalidation of the transfer, the Court explained that

> [w]e concur with the trial court that the premiums assessed by the KRA against its subscribers are clearly *private* funds, as opposed to public, and are therefore not subject to control by the General Assembly. To arrive at this conclusion it is only necessary to identify the nature and purpose of the KRA and to identify its *sole* source of funding....

[I]ts [the KRA's] sole corporate purpose is to fund all claims and liabilities of the Special Fund. Its sole income is from premiums charged its subscribers ... The funding source of KRA is solely and exclusively from private sources.

710 S.W.2d at 857.

More recently, in *Haydon Bridge I,* 304 S.W.3d at 682, we applied the "private fund" holdings *of Armstrong* and *Thompson* to a current workers' compensation fund—the Special Fund portion of the Benefit Reserve Fund (BRF) maintained by the Kentucky Workers' Compensation Funding Commission (KWCFC)—and held that where, as in that fund, public monies have been commingled indistinguishably with "private" contributions—in that case insurance premiums—the commingled fund must be deemed entirely "private" under *Armstrong,* and thus not subject to budget—bill transfer to the General Fund.

Relying on the quoted portions of *Armstrong* and *Thompson,* and on *Haydon Bridge I,* the *Klein* and *Soccer Alliance* appellants note that the agency funds at issue here likewise get no support from the General Fund [9] but instead derive their income solely from private sources, the regulatory fees and fines provided for in the enabling statutes. Accordingly, they contend, these funds, too, should be deemed "private" and exempt from budget-bill transfer to the General Fund. The appellants' contention, however, cannot withstand scrutiny.

If the source of the money in the state's coffers were the sole determinant of its character, then *all* of the state's money, even the General Fund, would be "private," since ultimately all of the state's money comes from private individuals and

---

9. H.B. 406 provides for fiscal year 2008–2009 and fiscal year 2009–2010 General Fund appropriations to HBC of $2.3 and $2.4 million respectively. According to Klein, however, the General Fund appropriations go exclusively to the State Fire Marshal, leaving the other HBC agencies to fend entirely for themselves.

entities. As *Armstrong* and *Thompson* make clear, however, it is the purpose of the fund, as well as its source, that determines whether a fund is to be deemed "private," and it does not require an exacting definition of the purpose or purposes of the employee pension and workers' compensation insurance funds addressed in *Armstrong, Thompson*, and *Haydon Bridge I* to distinguish them from the regulatory agency funds at issue here. Contrary to the appellants' assertions, the building code regulations supported by the HBC funds, and the charitable gaming regulations supported by the DCG fund do not exist for the benefit of the building contractors or charitable gaming licensees who pay fees and fines to the funds; instead they exist for the physical safety and the economic security of the public at large. Those are purely public purposes, and the funds maintained to further them give rise to no private property or contract rights in the persons or entities so regulated. In short, the regulatory funds at issue here are not "private" funds under *Armstrong* and its progeny, and thus are not exempt from budget-bill transfer to the General Fund.

### III. The Fund Transfers Did Not Violate KRS 48.315.

█ Next, both the *Klein* and *Soccer Alliance* appellants maintain that even if the Constitution does not preclude the challenged transfers, KRS 48.315 does. That statute provides that

> [t]he General Assembly may provide in a budget bill for the transfer to the general fund for the purpose of the general fund all or part of the agency funds, special funds, or other funds established under the provisions of KRS . . . .

There follows a list of some sixty-three statutes, beginning with KRS 15.430 (establishing the Law Enforcement Foundation Program Fund) and ending with KRS 342.480, a statute that was repealed as of January 4, 1988. This long list of statutes, both active and defunct, is concluded with an "etc." Because the HBC and DCG funds at issue here are not among those included in the KRS 48.315 list, the appellants contend that the General Assembly should be deemed to have declared them off limits with respect to budget-bill transfers. The Court of Appeals panels rejected that contention and held that the concluding "etc." brought the challenged funds within the purview of KRS 48.315's grant of authority. Although we agree with the appellants' assessment of the statute as hopelessly ambiguous, we are convinced that the Court of Appeals panels addressed the ambiguity appropriately.

The problem, plainly, is that the statute does not make clear its applicability to statutory funds not included in the list. On the one hand, the painstaking listing suggests, if not the exhaustion of everything the General Assembly had in mind, at least the deliberate exclusion of something. The fact that amendments to the statute have removed funds from the list also strongly suggests that some, at least, of the unlisted statutory funds are meant to be outside the ambit of KRS 48.315.[10] On the other hand, as the Court of Appeals panels observed, the plain meaning of "et cetera" ("and the rest") is that something not expressly listed is to be included. We are stuck then in the position of knowing that some of the unlisted statutory funds are in and that some of them are out, but we have not been given any way of knowing which is which.

---

**10.** H.B. 461 (2003), for example, removed from the list KRS 16.565, KRS 61.580, and KRS 78.650, all retirement fund accounts. 2003 Ky. Acts, ch. 169, sec. 4(1).

The *Klein* and *Soccer Alliance* appellants offer what at first glance seems a plausible way out of this dilemma. Because the listed statutes are in numerical order, they argue, "etc." refers only to funds appearing farther along in the Kentucky Revised Statutes, the notion being that the statute's drafter set out to make an exhaustive list, but becoming understandably exhausted along the way, threw in the towel after KRS 342.480. The problem with that construction, tongue-in-cheek aside, is that it does not account reasonably for the painstaking selection before the "etc." and the total lack of selection after.

We are left simply with an ambiguous statute, at least with respect to fund-creating statutes not on the list. The appellants contend that in this position the presumption should be against KRS 48.315's application to unlisted statutes, but for a couple of reasons we think the presumption goes the other way. First, as we noted in *Haydon Bridge I*, 304 S.W.3d at 703, KRS 48.310(2) provides more generally for the suspension of statutes in budget bills: "A budget bill may contain language which exempts the budget bill or any appropriation or the use thereof from the operation of a statute for the effective period of the budget bill." Absent some clear indication that KRS 48.315 was meant *not* to apply, then, the general budget-bill authority under KRS 48.310(2) suggests that the General Assembly, as a rule, does not intend to deprive itself of whatever authority it has to suspend statutes for the sake of effecting budget-bill fund transfers.

Another reason for presuming, in the absence of some clear indication to the contrary, that KRS 48.315 applies to these transfers, is simply that the General Assembly applied it. The statute is, after all, the General Assembly's handiwork, and

absent some compelling reason to think otherwise, the General Assembly may be presumed to know its own intent. What circumstances might provide a clear indication that KRS 48.315 was meant not to apply we need not decide (although a statute's having been removed from the list would pose an interesting question), since the appellants have offered no reason for exempting the HBC and DCG funds beyond their absence from the KRS 48.315 list, and that, we agree with the Court of Appeals panels, is not enough.

## IV. The Fund Transfers Were Not Otherwise Unconstitutional.

The appellants, in kitchen-sink fashion, refer us to several other Sections of the Constitution allegedly violated by the challenged transfers. Since all of these additional claims rely on the contention that the transfers had the effect of converting regulatory fees to taxes, our previous rejection of that contention answers these additional claims as well.

Section 51 was not violated because, under *Armstrong's* construction of that Section, a budget bill may provide for the suspension of anti-lapse provisions so as to allow for the transfer of fund surpluses to the General Fund. Because the appellants have not shown that anything beyond fund surpluses was involved in these transfers, no question arises as to whether a budget bill can suspend statutory provisions providing for the purpose of a levy.

Section 2 was not violated, either with respect to due process or to equal protection, because, under the cases cited above in the discussion of Section 180 and *City of Henderson*, the repurposing of surplus agency funds serves a valid public purpose and does not impose a tax, much less an unequal tax. As noted in that discussion, we are not unwilling to entertain claims that regulatory fees have become so di-

vorced from regulatory expenses as to amount to taxes and to be improper, but the claim must be based on a particularized showing of obvious disproportionality between the fee and expenses, and no such showing has been made in these cases.

Because the transfers did not effect a tax, sections 171 and 181 were not implicated.

## V. The *Soccer Alliance* Appellants Claim That Charitable Gaming Fees Were Unlawfully Increased Was Not Preserved For Review.

■ Finally, the *Soccer Alliance* appellants complain that DCG upped the rate of the charitable gaming fee from .53% to .60% in July 2008 in violation of KRS 238.570(3)(b)'s provision that the rate be adjusted "[o]n October 1 of each odd-numbered year." They want their fees back to the extent of the allegedly unlawful increase. Apparently, DCG neglected to adjust the rate in October of 2007 and was attempting to correct the lapse. Be that as it may, the Court of Appeals panel declined to address this claim because, although it was broached in the trial court, the trial court did not rule on it. We agree with the Court of Appeals panel that "review" here is not appropriate.

■ As *Soccer Alliance* correctly notes, an appellate court may affirm a trial court's judgment on a ground the trial court did not address, provided only that the alternative ground was brought to the trial court's attention and is otherwise supported by the record. *Fischer v. Fischer,* 197 S.W.3d 98 (Ky.2006). Here, however, the *Soccer Alliance* appellants are not asking us to affirm on an alternative ground the trial court's judgment invalidating the $700,000 transfer from DCG to the General Fund. It is asking rather that we in effect supplement the judgment by finding the necessary facts and ruling in the first

instance on a separate claim, a claim that was introduced in the trial court, but for whatever reason was dropped there and never adjudicated. That we cannot do. As an appellate court, we review judgments; we do not make them. *Calhoun v. CSX Transp. Inc.,* 331 S.W.3d 236, 245 (Ky.2011) ("In this Commonwealth, it is axiomatic that appellate courts are not fact-finders.").

## CONCLUSION

In sum, although we agree with the appellants that under Sections 51 and 180 of the Kentucky Constitution, and under *City of Henderson* and its progeny, the state's regulatory agencies may not be turned into conduits of tax revenue in the guise of regulatory fees, it is not unlawful for the General Assembly to provide in a budget bill for the suspension of anti-lapse provisions in agency enabling statutes and for the transfer to the General Fund of surpluses incidentally existing in agency accounts. Because the appellants have not shown that the budget-bill transfers they object to crossed the line from lawful surplus to unlawful tax, we agree with the Court of Appeals panels that their claims for relief must be denied. Accordingly, in both 2012–SC–000071 (*Klein*) and 2012–SC–000197 (*Soccer Alliance*) we hereby affirm.

MINTON, C.J.; CUNNINGHAM, KELLER, and NOBLE, JJ., concur. VENTERS, J., dissents by separate opinion in which SCOTT, J., joins.

VENTERS, J., dissenting.

I respectfully dissent. As the majority concedes, Appellants raise "important, legitimate questions" about the recurrent and now habitual practice of the executive and legislative branches to suspend certain statutes in order to divert license fees and

user fees collected from citizens engaged in regulated activities. Citing to *Armstrong v. Collins,* 709 S.W.2d 437 (Ky. 1986), defenders of the practice justify it upon the questionable grounds that the suspensions are just "temporary" and the diverted money is just "surplus," and, therefore, subject to dispensation far removed from the purposes that justified their collection. It's the same rationalization invoked by the heroin addict who needs just one more "temporary" fix, or the alcoholic who isn't really drinking because he only had "two beers."

It is, of course, beyond the purview of the judicial branch to concern itself with the wisdom of such fiscal policies, whether they are invoked once or perpetuated in serial fashion through a number of budget cycles. We address only the legality of the policy. I agree with Franklin Circuit Judge Phillip Shepherd's conclusion in the *Louisville Soccer Alliance* case that this supplemental method of funding state government unconstitutionally converts license fees, lawfully collected pursuant to the state's police power, into tax levies which, when diverted to other purposes, violates Kentucky Constitution § 180.[11]

Until now, it had been the well-settled law of this Commonwealth that the state's police powers—that is, the power to regulate certain occupations and activities in order to protect the health, welfare, and safety of the public—"cannot be used to raise revenue unless it be an incident in the accomplishment of a proper end of promoting order, safety, health, morals or general welfare, to which end the fees have a reasonable relation. The object [of the fees collected] must always be regulation."

*Bond Bros. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.,* 307 Ky. 689, 211 S.W.2d 867, 873 (1948). To emphasize the point, it is worth noting that the fees collected from Louisville Soccer Alliance and other businesses, individuals, and institutions subject to state regulatory agencies have passed constitutional muster *only* because they are not imposed for the purpose of raising general revenue for the state, but are instead fees collected under the police power for the specific purpose of regulating the activity of charitable gaming. See *Commonwealth v. Louisville Atlantis Cmty./Adapt, Inc.,* 971 S.W.2d 810, 815 (Ky.App.1997), citing *Long Run Baptist Ass'n v. Sewer Dist.,* 775 S.W.2d 520, 522 (Ky.App.1989) and *Gray v. Methodist Episcopal Church,* 272 Ky. 646, 114 S.W.2d 1141, 1142 (1938).

The fundamental principle, acknowledged just 23 years after the adoption of the present Constitution in *City of Henderson v. Lockett,* 157 Ky. 366, 163 S.W. 199 (1914), provides that license fees generated under the police power may not be so large as to achieve a revenue-producing purpose:

> The fee that may be imposed under the police power is one that is sufficient only to compensate the municipality for issuing the license and for exercising a supervision regulation over the subjects thereof. **Anything in addition to this amounts to a tax for revenue, and cannot be upheld as a valid exercise of the police power.**

163 S.W. 199, 201 (1914). (emphasis added).

Under this fundamental principle, the millions of dollars of so-called "surplus"

---

11. Ky. Const. § 180: "Every act enacted by the General Assembly, and every ordinance and resolution passed by any county, city, town or municipal board or local legislative body, levying a tax, shall specify distinctly the purpose for which said tax is levied, and **no tax levied and collected for one purpose shall ever be devoted to another purpose.**" (emphasis added).

fees swept from the accounts of the regulatory agencies for purposes *not* connected with the agencies' police powers became, in substance and effect, tax revenue levied and collected for one purpose but ultimately devoted to another. That is a violation of § 180. Moreover, the funds at issue here cannot fairly be regarded as "surplus" because there is absolutely no indication in the record that they are not needed to achieve the purpose for which they were originally collected.

The Majority brushes aside that principle citing to *Field v. Stroube*, 44 S.W. 363 (Ky.1898) as support for the theory that the funds in question are merely "surplus," like pocket change leftover at the end of the day, money not needed by the agencies to perform their regulatory functions. But, the "surplus" funds involved in *Stroube* bear no similarity to the current situation.

In *Stroube*, a special levy had been imposed to fund the construction of a new courthouse for Bracken County. When the construction project was completed, money collected for the project was left over. To be clear, it was impossible to use the levied funds for the intended purpose because that purpose had been fully achieved. When the diversion of the leftover money, "the surplus," was challenged, the Court held "when the object to be attained by the levy has been accomplished, and a surplus remains, it must be treated as a part of the general funds of the county and available for general county purposes." *Field v. Stroube*, 103 Ky. 114, 44 S.W. 363 (1898). In stark contrast, it is obvious beyond dispute that the "object to be attained" by the imposition of the regulatory fees has not been accomplished and, indeed, since all of the agencies involved are ongoing and enduring components of our bureaucracy, the only reasonable conclusion is that the object to be attained (ongoing regulation) has *not* been finally

achieved, nor will it be attained in the foreseeable future.

Other cases in which "surplus" funds were properly transferred into the general fund follow the same pattern: there was a true surplus left over after the purpose of the assessment was completed. See, e.g. *Fannin v. Davis*, 385 S.W.2d 321 (Ky. 1964) (involving road and bridge construction); *City of Ashland v. Bd. of Educ.*, 286 Ky. 69, 149 S.W.2d 728 (1941) (construction of school buildings); *Overall v. City of Madisonville*, 125 Ky. 684, 102 S.W. 278 (1907) (construction of a municipal lighting plant; *Falls City Const. Co. v. Fiscal Court*, 160 Ky. 623, 170 S.W. 26 (1914)) (courthouse construction).

I agree with the resolution in each of the foregoing cases because in each instance, a true "surplus" existed—money was collected that could not be used for its intended purpose. The impossibility of matching the ultimate cost of a particular project with the actual revenue generated by the fees levied to attain it virtually assures that, in the usual case, some surplus will exist when the objective is finally achieved. Because the fees cannot reasonably be refunded, a one-time diversion of the surplus to the general fund as a kind of escheat does not convert the surplus into general tax revenue. But here, the money swept into the general treasury was not the loose change left over when the objective had been achieved. To the contrary, the license fees and user fees collected by the regulatory agencies here were intended to pay for ongoing regulatory functions, such as policing the building industry and charitable gaming activities, which have not ended. They were not, like the funds levied in *Stroube* and other cases, assessed to fund a finite objective like a bridge or courthouse project. There can be no "surplus" of funds when the purpose for collecting the fees continues, and the fees continue to be collected from the regulated

parties. To call such funds "surplus" is to ignore the plain meaning of the term.

The majority chides the Appellants for failing to provide statistics showing that the fees being collected by the affected agencies greatly exceeded the actual costs of administering the regulated activity. That completely misses the point. Appellants' central contention is that legislative raid on the agencies' restricted funds was illegal and, because those funds were diverted to the general treasury, they are no longer available to service the agencies' ongoing regulatory responsibilities, thereby increasing the user fees and license fees that must be charged in the future. The claim that the fees are excessive arises only because the fees were accumulated in restricted funds that were diverted from the regulating agencies. The fact that each agency here has ongoing regulatory responsibilities proves with absolute certainty that the funds are not surplus.

I also agree with Judge Shepherd's conclusion that the legislation enacted to cover the ongoing diversion of restricted funds violates § 51 of the Kentucky Constitution. See *Grayson Cnty. Bd. of Educ. v. Casey*, 157 S.W.3d 201 (Ky.2005). I disagree with the Majority's conclusion that *Armstrong* completely settles the issue. As Judge Shepherd observed, "the Court in *Armstrong* was very explicit that its ruling applied only to 'temporary, determinable suspensions of statutes relating to the appropriation of public funds.'" 709 S.W.2d at 446. The judge further noted "if the reasoning of [the Appellees] is accepted, the legislature could merely pass an omnibus bill with the title 'an act related to state government' and completely circumvent the requirements of Section 51."

The Majority charitably refers to this funding mechanism as a "budget balancing measure." It is more accurately likened to the blue smoke and mirrors used by the sideshow magician to hide the rabbit up his sleeve. It is a sleight-of-hand technique for shifting the financial burden of the general government while avoiding the unpalatable prospects of increasing taxes, decreasing services, or both. The diversion of regulatory fees to the general fund amounts to a tax on the future participants in the regulated activities, a decrease in the future services of the regulatory agencies, or both. Doing so violates § 180 of the Kentucky Constitution.

Today, we further enable the state's dependence upon the biennial sweep of regulatory accounts. This case arose from the 2008 budget process and the sweep of $51 million of "surplus" funds from regulatory accounts after a "temporary" suspension of the statutes prohibiting the practice. That temporary fix has been repeated in every subsequent budget cycle. In fiscal year 2012, $116.5 million was diverted from regulatory accounts; in 2013, the figure was $89.1 million; based upon the 2012 budget bill, $86.1 million will be transferred in 2014. The current executive branch budget bill (HB 235) estimates that for fiscal year 2015, $214.7 million will be transferred and, in 2016, $69.8 million will be transferred. That the diversion of fees collected under the police power for regulatory purposes is now built into the budget planning process simply proves that the funds being collected are not really "surplus," and that the biennial suspension of statutes prohibiting the practice is not really temporary. The regulatory agencies now know they must artificially produce a "surplus" by assessing higher fees and providing less service and less protection. Our complicity in that practice nullifies § 180. Therefore, I dissent.

SCOTT, J., joins.