RENDERED: AUGUST 29, 2019
TO BE PUBLISHED

# $\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$

2018-SC-000461-CL



IN RE:

KENTUCKY EMPLOYEES RETIREMENT
SYSTEM AND BOARD OF TRUSTEES OF
KENTUCKY RETIREMENT SYSTEMS

|  | ON CERTIFICATION FROM |
| --- | --- |
| V. | UNITED STATES COURT OF APPEALS |
|  | FOR THE SIXTH CIRCUIT |
|  | NOS. 16-5569 AND 16-5644 |

SEVEN COUNTIES SERVICES, INC.

## OPINION OF THE COURT BY JUSTICE HUGHES

## <u>CERTIFYING THE LAW</u>

By order entered November 1, 2018, this Court granted the United States

Court of Appeals for the Sixth Circuit's request for certification of law on the

following issue:

> Whether Seven Counties Services, Inc.'s participation as a
> department in and its contributions to the Kentucky
> Employees Retirement System are based on a contractual or
> a statutory obligation.

After careful consideration, we hold that Seven Counties Services, Inc.'s

participation in and its contributions to the Kentucky Employees Retirement

System (KERS) are based on a statutory obligation.

## FACTS AND PROCEDURAL HISTORY

This case arises from the efforts of Seven Counties, a non-profit provider of mental health services, to reorganize and rehabilitate its finances under Chapter 11 of the Bankruptcy Code. At its request, in 1979 Governor Julian Carroll designated Seven Counties a "department" for purposes of participating in KERS, a public pension system. Subsequently Seven Counties paid into KERS to secure retirement benefits for its employees. Because the rate of required employer contributions has increased dramatically in recent years, Seven Counties initiated bankruptcy proceedings in April 2013, primarily to reject its relationship with KERS as an executory contract. With KERS maintaining that Seven Counties has statutory as opposed to contractual obligations to KERS, the nature of the parties' relationship is central to a pending appeal in the Sixth Circuit. To address adequately the question certified to this Court, a brief history of both Seven Counties and KERS is necessary.

### I.     Seven Counties Services, Inc.

Historically, states were responsible for treating the mentally ill, and this often resulted in their institutionalization. In 1963 Congress passed the Community Mental Health Act which provided federal funding to establish Community-Based Mental Health Centers (CMHCs) designed to begin the privatization of mental health services. Using the federal funding, Kentucky chose to provide services through CMHCs, passing laws that enabled their creation and regulation. To become a CMHC in Kentucky, an entity first has to

2

be a non-profit organization and receive designation from the Kentucky Cabinet for Health and Family Services.[1]

One of the first CMHCs to incorporate in the state was River Region Mental Health-Mental Retardation Board, Inc.[2] Most River Region employees were former employees of the Kentucky Department of Mental Health, and reluctant to leave the state system and give up retirement benefits accrued through KERS. In response, Governor Edward Breathitt issued an executive order in 1966 declaring that CMHCs "are permitted to become and are participating agencies" in KERS.[3] Executive Order 66-378. This expansion applied to all CMHC employees, not just those transitioning from state employment. River Region became a participating department in KERS by an August 6, 1974 executive order. Executive Order 74-587.

In 1978, River Region filed a petition for Chapter 11 bankruptcy.[4] The Kentucky Department of Human Resources intervened, urging the Bankruptcy

---

[1] Prior to the designation of an organization as a CMHC, the Kentucky Cabinet for Health and Family Services (Cabinet) reviews an organization's bylaws, board composition and operations to determine whether they meet minimum standards. CMHCs are regulated by the Cabinet pursuant to Kentucky Revised Statutes (KRS) Chapter 210.

[2] When established, this CMHC was named Region Eight Mental Health-Mental Retardation Board, Inc., and was known as "Region Eight." It was later renamed River Region.

[3] At the time the executive order was entered, three CMHCs declined to participate in KERS and instead created their own retirement programs. KERS sued these entities, and ultimately the state's high court determined that CMHCs were not required to participate in KERS. *Ky. Region Eight v. Commonwealth*, 507 S.W.2d 489 (Ky. 1974). *Region Eight* is discussed *infra*.

[4] Interestingly, as outlined in the Bankruptcy Court opinion, an employee group twice challenged River Region's right to be adjudicated bankrupt and contended that it was operated by the Commonwealth. In a 1980 opinion the Bankruptcy Court held that River Region was not a state agency or instrumentality. *In re Seven Ctys. Serv.,*

Court not to immediately declare River Region bankrupt, as termination of its business would cut off mental health services in the region it serviced. Soon thereafter, Seven Counties, a newly-formed entity, purchased the assets of River Region through the bankruptcy process and agreed to assume responsibility for providing services in the areas formerly served by River Region. Even though Seven Counties is the direct successor of River Region, it was not automatically drawn into KERS.

In 1978, Seven Counties sought an Attorney General Opinion that it could qualify as a "department" capable of participating in KERS. The Attorney General acknowledged Seven Counties' eligibility pursuant to KRS 61.510(3): "Any other body, entity or instrumentality designated by Executive Order by the Governor, shall be deemed to be a department [for purposes of KERS] notwithstanding whether said body, entity or instrumentality is an integral part of state government." Subsequently, Governor Carroll entered Executive Order 79-78 allowing Seven Counties to participate in KERS.

Today, Seven Counties is a Kentucky non-profit organization that has provided mental health services in Louisville, Kentucky, and surrounding areas for over 30 years. In its role as a CMHC, Seven Counties provides services to approximately 33,000 people annually, including adults and children with

---

*Inc.*, 511 B.R. 431, 441 (Bankr. W.D. Ky. 2014) (citing *Greenberg v. River Region Mental Health-Mental Retardation Bd., Inc., (In re River Region Mental Health-Mental Retardation Bd., Inc.)* slip op. at *4, Case No. 78-00193-L (Bankr. W.D. Ky. Jan 8, 1980)). On appeal, the United States District Court for the Western District of Kentucky and the Court of Appeals for the Sixth Circuit affirmed the Bankruptcy Court's decision.

mental illnesses, emotional or behavioral disorders, disabilities, and alcohol or drug addictions.

## II.     The Kentucky Employees Retirement System (KERS)

In 1956, the Kentucky General Assembly established KERS and a board of trustees to administer the system. 1956 Ky. Acts ch. 35. Today, Kentucky Retirement Systems (Systems)[5] is a statutorily-created agency of Kentucky's executive branch that, through its board of trustees, administers three of Kentucky's retirement systems — the County Employees Retirement System, the State Police Retirement System, and KERS. KRS 61.645. The goal of KERS is to provide a secure means of retirement savings for the employees of the Commonwealth, its departments, agencies and instrumentalities. KERS is a cost-sharing, multiple-employer, defined-benefit retirement plan. Participating employers and employees pay into KERS at a set rate and, upon retirement, KERS pays out the employee's defined benefit based on the number of years served, a "benefit factor," and an employee's final compensation. *See* KRS 61.510 *et seq.*

KERS implements two plans: hazardous and non-hazardous plans that are best described as different tiers within a single defined benefit plan.[6]

---

[5] We refer to the Kentucky Retirement Systems as "Systems" to avoid confusion with the initials commonly used to designate the Kentucky Revised Statutes (KRS). KERS and Systems are referred to generally as simply KERS where appropriate.

[6] In general, employees eligible for the hazardous plan are police officers, firefighters, and corrections officers. Hazardous duties that qualify for the hazardous plan are determined by state law. *See* KRS 61.592.

5

Generally, employees contribute 5% of their compensation.[7] The employer contribution consists of the cost of funding the benefit earned that year, plus the amount needed to fund the actuarially accrued liability.[8] This actuarially required contribution rate is known as the ARC and is a payment made by employers toward past unfunded liability in order to ensure KERS has the resources needed to pay benefits. The ARC is important because the solvency of KERS to meet future payment obligations depends on consistent payment of the ARC. *Ky. Emp. Ret. Sys. v. Seven Ctys. Serv., Inc.,* 550 B.R. 741, 749 (W.D. Ky. 2016). As the District Court pointed out in its opinion in this case, "[i]t does not take an expert to conclude that KERS's non-hazardous plan is in poor shape." *Id.*

In the early 2000s, KERS became underfunded for three primary reasons: (1) market losses in 2000-01 and 2008-09 diminished the fund's asset values by 17%; (2) the General Assembly approved increased retirement benefits to keep up with inflation without providing additional appropriations to fund the increase; and (3) the General Assembly consistently failed to

---

[7] KRS 61.560(4) requires each employer to "pick up" employees' contributions, resulting in employees' contributions being withheld before taxes.

[8] KRS 61.565(1)(a) states that each employer "shall contribute annually to the respective retirement system an amount determined by the actuarial valuation completed in accordance with KRS 61.670 . . . ." Employer contributions "shall be equal to the sum of the 'normal cost contribution' and the 'actuarially accrued liability contribution.'" *Id.* At the time Seven Counties filed for bankruptcy, the employer contribution rate was 23.61% of each employee's compensation.

6

require contribution rates commensurate with the ARC.[9] *Seven Ctys.*, 550 B.R. at 749–50. The burden of this shortfall in funding falls on the employers participating in KERS.[10]

Kentucky's General Assembly responded to the funding crisis by increasing employer contribution rates in 2008 and in 2013 it required employers participating in KERS — including the State itself — to contribute at the full, actuarially required rate going forward. Recognizing the burden this placed on some participating employers, the legislature provided assistance to CMHCs, keeping their rates somewhat lower than those of other employers in KERS and capping the contribution rate at 24%. Nevertheless, as of April 2013, Seven Counties' contribution rate rose well above its historic single-digit rate. The Bankruptcy Court noted that with the required contribution rate of 24% of wages, Seven Counties could either perform work in furtherance of its charitable mission or pay its KERS contributions and be forced to terminate operations.[11] KERS estimates that if Seven Counties is permitted to withdraw from the pension system, it will leave behind a shortfall of over $90 million, to

---

[9] In its opinion, the District Court noted that the General Assembly had failed to set an employer contribution rate meeting the ARC in fifteen of the previous twenty-two years.

[10] Employee contribution rates, which provide KERS's other source of income, are capped by statute. *See* KRS 61.560(1).

[11] Other employers' rates increased to almost 27% beginning in July 2013. The Bankruptcy Court determined that even with the 24% employer contribution cap, the employee expense would account for two-thirds of Seven Counties' gross revenues, leaving it with insufficient funds to provide its services. *In re Seven Ctys.*, 511 B.R. at 453.

be picked up by other employers in the pension system and, ultimately, Kentucky taxpayers.

## III.  Procedural History of the Parties' Litigation

On April 4, 2013, Seven Counties filed a Chapter 11 bankruptcy petition seeking to reject its obligation to participate in KERS. As the Bankruptcy Court noted, the procedural history of this case is "involved and extensive". *In re Seven Ctys.*, 511 B.R. at 437. KERS objected to the Chapter 11 petition and on April 29, 2013, Seven Counties filed an adversary proceeding.[12] The adversary proceeding sought a declaration that Seven Counties was ineligible to participate in KERS or that KERS was not a governmental plan, which would permit Seven Counties to withdraw under the Employee Retirement Income Security Act (ERISA).[13] KERS filed a motion to dismiss the adversary proceeding, which was denied. KERS appealed the denial, and that appeal is currently stayed pending this Court's decision.

KERS also commenced its own adversary proceeding, contending that Seven Counties is a "governmental unit," and therefore ineligible to file under

---

[12] In bankruptcy court, an adversary proceeding is a "lawsuit that is brought within a bankruptcy proceeding, governed by special procedural rules, and based on conflicting claims usually between the debtor (or the trustee) and a creditor or another interested party." BLACK'S LAW DICTIONARY (11th ed. 2019). A party in interest, including a creditor, "may raise and appear and be heard on any issue in a case under" Chapter 11. 11 U.S.C. § 1109.

[13] ERISA is a federal law that sets minimum standards for most retirement and health plans to protect individuals working in the private sector. It does not cover plans established or maintained by the government. ERISA requires retirement and health plans to keep members informed about important aspects of their plans; sets standards for benefits and funding; and establishes a grievance and appeals process to ensure benefits are provided. *See* 29 U.S.C. §§ 1001–1461.

Chapter 11, and that Seven Counties should be required to comply with its statutory obligations to contribute to KERS. Seven Counties countered that it is not a "governmental unit" and that it has an executory contract with KERS that may be rejected pursuant to 11 U.S.C. § 365.[14]

The trial began on March 11, 2014, and on May 30, 2014, the Bankruptcy Court found in favor of Seven Counties, holding that it is not a "government unit" and is eligible to file for Chapter 11 bankruptcy; that it is not compelled to continue participation in KERS; and that it is entitled to reject the unwritten executory contract it has with KERS in the exercise of its sound business judgment. Simply put, the Bankruptcy Court determined that because Seven Counties' relationship with KERS was contractual, it could reject the contract in bankruptcy and leave the retirement system. KERS appealed the decision to the United States District Court for the Western District of Kentucky and requested that the District Court certify a question to this Court.

On appeal, KERS argued (1) that there was no evidence of a contract between it and Seven Counties, and that, even if there was a contract, it was

---

[14] Seven Counties' executory contract argument required the Bankruptcy Court to first determine whether Seven Counties and KERS entered a contract under Kentucky law, and then determine whether the contract is executory under federal law. The Bankruptcy Court found all elements of a valid contract — offer and acceptance, full and complete terms, and consideration — to be present. *In re Seven Ctys. Serv., Inc.*, 511 B.R. at 477. After determining that Seven Counties has a continuing future obligation to contribute to KERS, and that doing so is impossible and will result in termination of its operations, the Bankruptcy Court concluded that the contract is executory, and thus can be rejected under 11 U.S.C. § 365.

not executory, *i.e.*, not subject to rejection in the bankruptcy proceeding; (2) the Bankruptcy Court erred in determining that Seven Counties was not a "governmental unit," and (3) the Bankruptcy Court mischaracterized the KERS system. The District Court determined that certifying a question was unnecessary and largely upheld the Bankruptcy Court's decision, affirming most of the analysis. The District Court reversed only as to the Bankruptcy Court's finding that KERS is a "multi-employer plan," because it is actually a "multiple-employer plan." KERS appealed the District Court's decision to the United States Court of Appeals for the Sixth Circuit.

The Sixth Circuit reviews the Bankruptcy Court's decision directly, affording no deference to the intervening District Court opinion. *Ky. Emp. Ret. Sys. v. Seven Ctys. Serv., Inc.*, 901 F.3d 718, 724 (6th Cir. 2018). In a 2-1 decision, the Sixth Circuit affirmed the Bankruptcy and District Courts' finding that Seven Counties is eligible to file for Chapter 11 bankruptcy by holding that it is not a "governmental unit" within the meaning of the Bankruptcy Code. The Sixth Circuit also determined that the issue of the legal relationship between Seven Counties and KERS is a question of law properly certified to this Court. Noting the determinative nature of the issue, the Sixth Circuit stated that this Court's decision on the nature of the relationship between the two entities will influence the final resolution of the case in the federal courts. The Sixth Circuit certified the question of whether Seven Counties' contributions to KERS were based on a statutory or contractual obligation and held the remaining federal law issues in abeyance pending this Court's decision.

Both parties have briefed the certified question and presented oral arguments. KERS insists that Seven Counties' participation in KERS is pursuant to statute, not a contract, relying primarily on the plain language of the Kentucky statutes and the unmistakability doctrine. Seven Counties counters that its relationship with KERS is solely contractual, that KERS cannot compel Seven Counties' participation without violating Kentucky and federal law, and that it is not even eligible to participate in KERS.

## ANALYSIS

### I.      Employer Participation in KERS Is Exclusively Statutory

KERS, as noted, is a creature of statute established by the Kentucky General Assembly in 1956. 1956 Ky. Acts ch. 110. Participation in KERS has always been controlled by statute and has always entailed the Governor issuing an executive order. In 1956, newly enacted KRS 61.520 provided: "Each department will participate in the system when the Governor by appropriate executive order, the authority to issue such executive order being hereby granted, permits such department to participate in the system." 1956 Ky. Acts ch. 110 at § 3. A department was defined as "any state department, board or agency participating in the system in accordance with appropriate executive order . . . ." *Id.* at § 1. Thus, from its inception and continuing through to 2019, even traditional departments of state government have gained entrance to the KERS only by executive order as mandated by statute.[15]

_____

[15] KRS 61.520(1) currently provides in relevant part: "Each department determined by the board to be eligible and qualified for participation shall participate in the system when the Governor by appropriate executive order, the authority to

In 1976, just prior to Seven Counties joining KERS, KRS 61.520 provided

in relevant part:

(1)   Each department shall participate in the system when the governor by appropriate executive order, the authority to issue such executive order being granted, directs such department to participate in the system.  The effective date of such participation shall be fixed by the governor in his executive order.

* * * * * * *

(3)   All executive orders issued under authority of this section since July 1, 1956 are hereby ratified by the General Assembly and each participating and contributing department, board, agency, corporation, *mental health-mental retardation board*, or entity participating since that date under such executive order is hereby declared to be a participating department under the Kentucky employes [sic] retirement system.

(4]   Once a department participates it shall thereafter continue to participate.

"Department" was defined in KRS 61.510(3) as

any state department or board or agency participating in the system in accordance with appropriate executive order, as provided in KRS 61.520.  For purposes of KRS 61.510 to 61.700, the members, officers, and employes [sic] of the general assembly and any other body, entity, or instrumentality designated by executive order by the governor, shall be deemed to be a department notwithstanding whether said body, entity or instrumentality is an integral part of state government.

Against this statutory backdrop, Seven Counties, through its legal

counsel, in the fall of 1978 requested an opinion from the Kentucky Attorney

---

issue such executive order being granted, directs such department to participate in the system." Although since 2003 the Systems board has had a role in determining eligibility, 2003 Ky. Acts ch. 169, an executive order is still required in order for a department to participate in KERS.

General[16] "with regard to the eligibility for participation in [KERS] by Seven Counties . . . in the event that the Governor should direct their inclusion in the KERS by Executive Order." Ky. OAG 78-685. The Attorney General noted that Seven Counties was a newly created successor to River Region and that it had been designated by the Secretary of the Department for Human Resources "as the agency to assist in administering mental health-mental retardation programs and clinics pursuant to applicable Kentucky statutes." After citing the language from KRS 61.510(3) defining a department for KERS purposes to include any entity "designated by Executive Order by the Governor . . . notwithstanding whether said . . . entity . . . is an integral part of state government," id., the Attorney General opined that Seven Counties, like River Region before it, was eligible to participate in KERS.

Following the October 4, 1978 Opinion of the Attorney General, Governor Julian Carroll issued Executive Order 79-78 on January 14, 1979. The executive order provides in its entirety:

> WHEREAS, the Kentucky General Assembly in its 1974 session amended KRS 61.510(3) to permit any body, entity or instrumentality designated by Executive Order by the Governor to be a department for purposes of participating in the Kentucky Employes [sic] Retirement System, notwithstanding whether said body, entity or instrumentality is an integral part of state government; and

> WHEREAS, the Board of Directors of Seven Counties Services, Inc. has requested that an Executive Order be issued that would bring Seven Counties Services, Inc. into the Kentucky Employes [sic] Retirement System; and

---

[16] The record does not contain the letter from Seven Counties' counsel and KERS indicates that it was "not found in the course of discovery."

13

> WHEREAS, the Office of the Attorney General has issued an official opinion, OAG 78 685, expressing the opinion that Seven Counties Services, Inc. employes [sic] may begin to participate in the Kentucky Employes [sic] Retirement System upon the issuance of an Executive Order from the Governor to that effect.
>
> NOW, THEREFORE, I, JULIAN M. CARROLL, Governor of the Commonwealth of Kentucky, pursuant to the authority vested in me by Chapter 128 of the 1974 Kentucky Acts amending Section 61.510(3) of the Kentucky Revised Statutes, hereby designate Seven Counties Services, Inc. as a participating department in the Kentucky Employes [sic] Retirement System.

Although the executive order refers to a request from Seven Counties' Board of Directors, the record contains no correspondence that would constitute a request.[17] The Bankruptcy Court referred to a February 14, 1979 letter from the former executive director of Seven Counties, Howard Bracco, Ph.D., to KERS regarding participation but that two-sentence letter obviously postdates the executive order and, in any event, relates only to criteria for employee participation and the employee and employer contribution levels.

Analyzing the statutory framework and the interaction between KERS and Seven Counties at the inception of their relationship in 1979, as we must, we cannot possibly conclude that the two parties were negotiating and entering into a contract. KRS 61.520 outlined a mandatory statutory route to be followed by all employers desiring to be a "department" participating in KERS,

---

[17] The minutes of Seven Counties' November 10, 1978 Board of Directors' meeting refer to "the petitioning of the Governor to sign an Executive Order to allow [Seven Counties] to join KERS."

14

regardless of whether the "body, entity, or instrumentality is an integral part of state government." KRS 61.510(3). In examining that statutory route identified by our General Assembly, as oft noted, "our foremost objective is to determine the legislature's intent . . . ." *Maze v. Bd. of Dir. for the Comm. Postsecondary Educ. Prepaid Tuition Tr. Fund*, 559 S.W.3d 354, 363 (Ky. 2018). We determine legislative intent, "if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration." *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011). Always, "we look first to the language of the statute, giving the words their plain and ordinary meaning." *Richardson v. Louisville/Jefferson Cty. Metro Gov't*, 260 S.W.3d 777, 779 (Ky. 2008).

The plain language analysis of KRS 61.520 precludes any finding that the Governor was authorized to contract with any department (including any "body, entity, or instrumentality" that is not an "integral part of state government," KRS 61.510(3)) for participation in KERS. The statute authorized the Governor to issue an executive order — not to negotiate or execute a contract. The word "contract" and the concepts of offer, acceptance and consideration are never used in KRS 61.520. In construing statutes, we are "not at liberty to add or subtract from the legislative enactment or interpret it at variance from the language used." *Johnson v. Branch Banking & Tr. Co.*, 313 S.W.3d 557, 559 (Ky. 2010). Recognizing authority in the Governor to contract

15

on behalf of KERS would indubitably require either adding language to the statute or interpreting it in a way contradictory to its plain meaning.

In addition to violating our plain language approach to statutes, that construction would violate Kentucky law providing that "[t]he Governor has only such powers as are vested in him by the Constitution and the statutes enacted pursuant thereto." *Martin v. Chandler*, 318 S.W.2d 40, 44 (Ky. 1958). Decades ago, in *Royster v. Brock*, 79 S.W.2d 707, 709 (Ky. 1935), this Court noted that the office of governor was "unknown to common law" and created solely by our state constitution. The governor "has only such powers as the Constitution and Statutes, enacted pursuant thereto, vest in him, and *those powers must be exercised in the manner and within the limitations therein prescribed.*" *Id.* (emphasis added).

Moreover, the legislature purposefully uses the word "contract" in other parts of KRS Chapter 61, most notably in the "inviolable contract" provision codified at KRS 61.692. Subsection (1) of that statute states:

> For members who begin participating in the Kentucky Employees Retirement System prior to January 1, 2014, it is hereby declared that in consideration of the contributions by the members and in further consideration of benefits received by the state from the member's employment, KRS 61.510 to 61.705 *shall constitute an inviolable contract of the Commonwealth,* and the benefits provided therein shall not be subject to reduction or impairment by alteration, amendment, or repeal[.]. . .

(Emphasis added). The relationship between a member and KERS is clearly and unequivocally identified as a contract, an "inviolable contract" at that.[18] In

---

[18] Seven Counties begins its "Summary of the Legal Principles Germane to this matter by stating: "State statutory law itself acknowledges the contractual nature of

addition, contracts are referred to in several other provisions of KRS Chapter 61 including, for example, KRS 61.645(2)(d) which authorizes the Systems board to "contract for investment counseling, actuarial, auditing, medical, and other professional or technical services" and KRS 61.702(1)(a)1 which requires the board to "arrange by appropriate contract" for group hospital and medical insurance for KERS participants. The absence of any reference to a contract or even contract principles such as offer, acceptance and consideration in KRS 61.520 leads us to conclude that our General Assembly has dictated that participation in KERS is only by virtue of the statutory mechanism outlined in that statute, *i.e.*, by executive order allowing such participation.

The only case from this Court that touches on the nature of the relationship created when a department seeks designation pursuant to KRS 61.520 is *Kentucky Region Eight v. Commonwealth*, 507 S.W.2d 489 (Ky. 1974), involving three CMHCs, then known as mental health-mental retardation boards. The previously-noted executive order from Governor Edward T. Breathitt provided that such boards "are permitted to become and are participating agencies in the [KERS]." *Id.* at 490. Three boards that did not wish to participate in KERS brought suit seeking a determination that entry into KERS was permissive not mandatory. Without reaching that issue, the Court held that the boards could not be KERS-participating employers because

---

the relationship between KERS and Seven Counties, KRS 61.692 . . ." This is patently erroneous. KRS 61.692 does not address the employer's relationship with KERS, only the contractual relationship between KERS and a member.

17

they did not qualify as "departments" as the term was then defined in KRS 61.510 ("'any state department or board or agency' participating in the system"). *Id.* The Governor's executive order was insufficient to create a relationship between the boards and KERS because the statutes alone governed entry and participation. The 1974 General Assembly responded to *Region Eight* by amending the definition of "department" to include entities "notwithstanding whether [they are] an integral part of state government" and by adding subsection (3) to KRS 61.520, quoted *supra* p. 12, ratifying expressly the prior executive orders regarding "mental health-mental retardation board[s]." The Court scrutinized the Governor's authority vis-à-vis KERS by looking carefully at the provisions of KRS Chapter 61 and offered no suggestion that the Governor had some broader "contracting" authority.

Resolution of the certified issue obviously turns on Kentucky law but we note that in similar circumstances, courts in other states have looked first to the statutes creating their retirement system. In *New York State Employees' Ret. Sys. v. Bd. of Sup'rs*, 283 N.Y.S. 405 N.Y. (Sup. Ct. 1935), *aff'd*, 296 N.Y.S. 286 N.Y. (App. Div. 1937), aff'd, 15 N.E.2d 434 N.Y. (1938), the New York statute allowed county officers and employees to participate in the retirement system upon adoption of a resolution by the county's board of supervisors. When Tioga County opted in but later sought to withdraw, the Supreme Court (later affirmed on appeal by the Appellate Division and the New York Court of Appeals) stated:

18

> But the relation between the state and the county here was not created by contract. It was created by legislation. The State Legislature created the Retirement System. Each county was permitted to say whether it would participate. When it elected to do so, the legislation became effective as to it. True, certain obligations grew out of its election, but these obligations were not contractual.

283 N.Y.S. at 409. Similarly Seven Counties elected to participate in KERS and pursued the route authorized by statute, KRS 61.520, creating a statutory—not contractual—relationship with the attendant benefits and obligations.

By contrast, California allows municipalities to participate in its state retirement system, California Public Employees Retirement System (CalPERS) by contract. *See In re City of Stockton,* Cal. 526 B.R. 35, 40 n.5 (Bankr. E.D. Cal 2015) ("In addition to acting as the pension system for employees of the State of California, CalPERS contracts with California municipalities in competition with other pension administrators to administer local pensions for municipalities.") Similarly, Pennsylvania statutes allow municipalities to "negotiate a contract" with the retirement system board. 53 Pa. Cons. Stat. § 881.402 (2004). The Bankruptcy Court cited case law from these states as recognizing a contractual relationship between the retirement system and a participating employer, but that is true only because the controlling statute expressly authorized contracts with certain employers. Kentucky statutes contain no such authorization.

## II.     Neither the Facts Nor Kentucky Law Supports the Contract Theory

Just as the statutes provide no support for the proposition that the Seven Counties/KERS relationship was contractual, the controlling documents

19

likewise give no indication whatsoever that in 1979 the parties intended to enter into a contract or perceived themselves as creating contractual obligations. As mentioned, the record does not contain any correspondence from Seven Counties purportedly relevant to the "contract formation" theory beyond a February 14, 1979 letter from Dr. Bracco, a letter written three weeks after Governor Carroll's executive order designating Seven Counties a department for purposes of KERS.[19] The letter not only post-dates the executive order, but simply contains two sentences about employee participation and contribution levels, nothing about an impending or recently concluded contract or any offer or acceptance. As for documentation on the KERS side of the alleged contract, the record consists of (1) Attorney General Opinion 78-685 issued October 4, 1978, recognizing Seven Counties' eligibility to seek designation for KERS participation from the Governor via executive order and (2) Executive Order 79-78 issued January 24, 1979, quoted in its entirety *supra*, granting the request of the Seven Counties' Board of Directors for an "Executive Order . . . that would bring Seven Counties . . . into the Kentucky Employes (sic) Retirement System." Again, the language used provides no basis for concluding that anyone involved in 1979 thought a contract was being formed. Seven Counties sought a designation recognized by Kentucky statute as the means of entry into KERS, the Attorney General

---

[19] The letter states in its entirety: "Employees who work 100 hours per month or more who have completed six months temporary status must participate in the Kentucky Employees Retirement System. Employees contribute 4% of gross earnings and Seven Counties Services contributes 7¼% of gross earnings."

opined that Seven Counties was eligible for that designation and Governor Carroll granted that designation by executive order, bringing Seven Counties and its employees into the retirement system pursuant to KRS 61.520.

The contract analysis adopted by the Bankruptcy and District Courts and advocated by Seven Counties disregards the controlling statutory language regarding KERS participation and attributes to the contemporaneous documents and interaction of the parties the characteristics of offer and acceptance, weight they cannot bear. As all parties acknowledge, and the federal courts have recognized, whether a contract exists between Seven Counties and KERS is a matter of state law. *See Butner v. United States*, 440 U.S. 48, 54 (1979). The fundamental elements of a contract in Kentucky (as in other jurisdictions) are "'offer and acceptance, full and complete terms, and consideration.'" *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828 (Ky. 2013). Seven Counties articulates the alleged offer and acceptance as follows:

> In this matter, Seven Counties became a participant in KERS through a voluntary arrangement that began with an inquiry by Seven Counties into whether it was eligible to join KERS. The State responded that Seven Counties was eligible. Seven Counties then voluntarily informed KERS of its desire to become a participant. This manifestation of intent constituted an offer to provide ongoing payments (contributions) to KERS in exchange for pension benefits that would accrue to Seven Counties' employees. This offer was then accepted by KERS when the Kentucky Governor issued an executive order formally allowing Seven Counties to participate in KERS. The Governor's executive order did not alter or modify the terms of Seven Counties' offer. Instead, the parties understood that the terms were contained and described in the statutory and regulatory framework that governs KERS and its participants.

21

The "voluntary arrangement" identified allegedly became a contract (subject to establishing contract terms and consideration) when Seven Counties' "offer"[20] was accepted by the Governor via executive order. This analysis, however, runs pell-mell into the language of KRS 61.520 which, as discussed, reflects no authority on the part of the Governor to contract for entry into KERS; his authority is limited to designation at which point the statutory provisions supply the terms of Seven Counties' and its employees' participation.

Even if the Governor had authority to contract, the "full and complete terms" element is problematic. Seven Counties maintains that "while the parties signed a written 'offer' and a written 'acceptance,' in the form of Seven Counties' letter requesting to join KERS and the Governor's executive order respectively, the other terms of their agreement are set forth in the relevant statutes and regulations . . . ." In short, the contract analysis requires converting state statutes and regulations regarding KERS into the terms of a binding contract. That proposition is a bridge too far.

Although this Court has never had occasion to consider the unmistakability doctrine, it is a natural corollary of our plain language approach to statutory construction. The United States Court of Appeals for the Sixth Circuit cogently articulated the doctrine in *Puckett v. Lexington-Fayette*

---

[20] We note again that the record contains no document that can be construed as an offer. The correspondence from Seven Counties to the Attorney General and later the Governor's office was never produced.

*Urban County Government*, 833 F.3d 590, 600-01 (6th Cir. 2016), from which

we quote at length:

> In order for a legislative enactment to be deemed a contract for the purposes of the Contract Clause, there must be a clear indication that the legislature intends to bind itself in a contractual manner. *See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) ("[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" (quoting *Dodge v. Bd. of Educ.*, 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937)));

> \* \* \* \* \* \* \*

> The presumption that a law is not intended to create private contractual rights is known as the "unmistakability doctrine." *United States v. Winstar Corp.*, 518 U.S. 839, 871, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In *Winstar*, the Supreme Court explained that the purpose of the doctrine is to avoid unnecessarily infringing on a state legislature's ability to legislate regarding state sovereign rights unless it is clear beyond any doubt that the legislature meant to give up that right. *Id.* at 873–76, 116 S.Ct. 2432.

> \* \* \* \* \* \* \*

> To determine whether a legislature intended to bind itself contractually, courts examine both the language of the statute itself and the circumstances surrounding its enactment or amendment—such as its apparent purpose, context, legislative history, or any other pertinent evidence of actual intent. *U.S. Trust Co.*, 431 U.S. at 17–18 n.14, 97 S.Ct. 1505; *see, e.g., Me. Ass'n of Retirees v. Bd. of Trs. of Me. Pub. Ret. Sys.*, 758 F.3d 23, 29–30 (1st Cir. 2014). Our role, therefore, is to determine whether the Act evinces a clear intent on the part of the Kentucky legislature to create contractual rights against the modification of a specific COLA formula. It is the burden of the party asserting the contract to overcome the presumption that a law is not intended to create private contractual or vested

23

rights. *Nat'l R.R. Passenger Corp.*, 470 U.S. at 466, 105 S.Ct. 1441.

Given our primary emphasis on discerning and implementing the intent of the legislature, *Maze*, 559 S.W.3d at 363, and focus on the plain language of statutes, *Shawnee Telecom*, 354 S.W.3d at 551, the unmistakability doctrine fits naturally into our jurisprudence. If the General Assembly "intends to bind itself in a contractual manner," *Puckett*, 833 F.3d at 600, it must clearly say so. The only instance in KRS Chapter 61 where the legislature has clearly indicated an intent to contract is KRS 61.692, quoted *supra*, where it explicitly states that for members participating in KERS prior to January 1, 2014, "KRS 61.510 to 61.705 *shall constitute an inviolable contract of the Commonwealth . . . .*" (Emphasis added). Nothing about KRS 61.520 indicates a clear intent to contract with participating employers nor do the statutes governing an employer's relationship with KERS and the Systems board ever indicate such intent.

Seven Counties does not address the unmistakability doctrine but suggests that it misses the point, positing that the issue is whether the parties' relationship is contractual in nature, "not whether any particular statute that regulates that arrangement is itself a contract." In this manner, the focus is changed from the initial argument that the statutes and regulations supply the terms of the contract, to the proposition that they merely regulate the contract. But, in fact, the contract theory relies on an offer from Seven Counties (not contained in the record) and an executive order making a statutory designation

24

for KERS participation as an "acceptance" of that offer creating a contract the terms of which are set forth in the statutes. While Seven Counties likens the situation to the Uniform Commercial Code, which *inter alia* statutorily regulates contracts for the sale of goods and can supply some contract terms, *see* KRS Chapter 355, here the statutes are offered up as the actual contract itself, *i.e.*, the terms of the contract between Seven Counties and KERS are in the statute books and the administrative regulations. Our longstanding plain language approach to statutory construction and the unmistakability doctrine preclude that result.[21]

Finally, the element of consideration is, at best, debatable. The Bankruptcy Court concluded "The parties voluntarily entered into a bargain that seemed beneficial to each: [Seven Counties] could attract and retain employees by offering them a KERS pension, and KERS could obtain contributions that improved the actuarial position of the state pension fund as a whole." 511 B.R. at 477. As KERS emphasizes, the Court cited no evidence that KERS's status improved actuarially as a result of Seven Counties' participation. While the employer and employee contributions were flowing in,

---

[21] Further complicating the contract theory is the fact that all "departments" enter KERS in an identical manner, via the designation process in KRS 61.520. If Seven Counties had a contract with KERS then every other department would arguably also have a contract. To the extent Seven Counties suggests that departments of state government under control of the executive, legislative or judicial branches fall in a different category, *i.e.*, have a statutory arrangement, then the provisions of KRS Chapter 61 are contract provisions for some but not for others, an unsustainable result.

KERS was also undertaking obligations to Seven Counties' employees so the actuarial improvement assumption is not necessarily valid.

In any event, public retirement systems are actually trusts created by statute. *See* RESTATEMENT (THIRD) OF TRUSTS, §§ 4 and 10.[22] As one court has observed, "[t]he statutory provisions creating the Fund . . . are, in effect, the 'terms of the trust.'" *Caruso v. N.Y. City Police Dept. Pension Funds*, 72 N.Y.2d 568, 574 (1988). KRS 61.515(2) creates a "Kentucky Employees Retirement Fund" and provides that "[a]ll assets received in the fund shall be deemed trust funds to be held and applied solely as provided in KRS 61.510 to 61.705." KRS 61.650 establishes the Systems board as "trustee" of KERS funds and imposes fiduciary duties on the trustees and employees to act "[s]olely in the interest of the members and beneficiaries." KRS 61.650(1)(a); (1)(c)1. By virtue of Kentucky statutes, the right to participate in KERS was extended to entities and organizations such as Seven Counties upon issuance of an appropriate executive order and the monies subsequently sent to KERS by Seven Counties were the contributions required of all employers participating in the retirement system, not consideration for a contract negotiated by Governor Carroll.

---

[22] "Some forms of trusts that are created by statute, especially public retirement systems or pension funds, . . . are administered as express trusts, the terms of which are either set forth in the statute or are supplied by the default rules of general trust law."

RESTATEMENT (THIRD) OF TRUSTS § 4, Comment (*g*).

"Public retirement systems or pension funds are invariably created by statute with no other trust instrument delineating the powers and duties of the boards of trustees that administer them, or the rights of the members as beneficiaries." *Id.* at § 10, Reporter's Notes, Comment (*b*).

## III. The Payments to KERS Are Statutorily Mandated Assessments

The Bankruptcy Court also backed into its contract conclusion by deciding that the payments from Seven Counties to KERS were not "regulatory fees, assessments, or taxation" and therefore "[t]o resolve the anomaly" the obligation "must be contractual in nature." 511 B.R. at 475. KERS never suggested that the employer contributions that Seven Counties made were in fact taxes and, indeed, nothing remotely suggests that they were. In *Klein v. Flanery*, 439 S.W.3d 107, 114 n.6 (Ky. 2014), we discussed the distinction between taxes and "particularized exactions":

> In a broad sense, perhaps, any monetary exaction by a governmental entity could be thought a tax, but a "tax" in the strict sense of monies levied to meet the general expenses of government has been distinguished in a variety of contexts from more particularized exactions, such as fines, user fees— tolls, for example—infrastructure assessments, or regulatory fees, such as those at issue here. In making the distinction, courts often sketch "a spectrum with a paradigmatic tax at one end and a paradigmatic [fine or] fee [or assessment] at the other." *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st. Cir. 1992) (citations omitted). They then attempt to locate the exaction at issue along the spectrum. The classic "tax" is "imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community . . . . The classic 'regulatory fee' is imposed by an agency upon those subject to its regulation . . . ."

This passage quickly illustrates that the monies remitted to KERS are neither taxes nor regulatory fees, the latter being impossible because Seven Counties is not regulated by KERS.[23] The monies are, however, "particularized exactions"

---

[23] By contrast, *Klein* dealt with classic regulatory fees paid by building contractors to the Kentucky Department of Housing, Buildings and Construction and

that may properly be described as assessments (as KERS proposes) without running afoul of any Kentucky law.

"Assessment" simply denotes "imposition of something, such as a tax or fine, according to an established rate." BLACK'S LAW DICTIONARY (11th ed. 2019). *See, e.g., Scalise v. Sewell-Scheuermann*, 566 S.W.3d 539 (Ky. 2018) (addressing "sanitation assessment" imposed monthly per household by a former fifth-class city). Although assessments are often associated with the construction of sewers and storm water drainage, *Long Run Baptist Ass'n v. Louisville & Jefferson Co. Metro. Sewer Dist.*, 775 S.W.2d 520, 522-23 (Ky. App. 1989), nothing in Kentucky law dictates that an assessment must be exacted to "improve the general conditions of health and comfort," as suggested by the Bankruptcy Court. 511 B.R. at 473-74. Seven Counties' payments to KERS were statutorily-based assessments, but more precisely, they were "employer contributions" to the KERS trust fund from which Seven Counties' employees would receive their retirement benefits, with the contributions constituting statutory obligations Seven Counties voluntarily assumed in order to obtain those pension benefits.

In another form of reasoning backwards, Seven Counties posits that the parties' relationship must be contractual because allowing Kentucky statutes to "compel" Seven Counties' participation in KERS violates federal law.

---

the consolidated matter, *Louisville Soccer Alliance, Inc. v. Beshear*, dealt with fees paid by non-profit organizations to the Department of Charitable Gaming. *See* 439 S.W.3d at 109.

28

Initially, we note that participation was not compelled but rather a voluntary act in 1979, *i.e.*, a request by Seven Counties to be designated by executive order for participation in a statutorily-created pension system. As for ERISA requirements, such as 29 U.S.C. § 1002(32), and the federal law consequences to KERS from this answer to the certified question, those issues are beyond the scope of this Opinion. More pertinently, those issues cannot dictate the nature of the Seven Counties/KERS relationship which simply is what it is, both in fact and in law.

## CONCLUSION

The Kentucky General Assembly in unmistakable language identified the relationship between KERS and its members as an "inviolable contract." The statute by which employers join KERS contains no such contract language and implying it would violate both our plain language approach to statutory construction and Kentucky law regarding the limitations on a governor's power. As for the contract theory, the parties' contemporaneous documentation contains not a hint of an intent to contract, leaving the theory with no support in either the facts or the law. Payments by an employer to KERS pursuant to KRS Chapter 61 are essentially assessments, statutorily-imposed contributions to the KERS trust fund required of the employer in order for its employees to be members of KERS. The relationship between KERS and Seven Counties is and always has been purely statutory.

All sitting. All concur.

COUNSEL FOR KENTUCKY EMPLOYEES
RETIREMENT SYSTEM AND BOARD OF
TRUSTEES OF KENTUCKY RETIREMENT
SYSTEMS:

Mark C. Blackwell
Katherine I. Rupinen
Joseph Patrick Bowman
KENTUCKY RETIREMENT SYSTEMS

Daniel R. Swetnam
Victoria E. Powers
Tyson A. Crist
ICE MILLER LLP


COUNSEL FOR SEVEN COUNTIES
SERVICES, INC.:

David Marcus Cantor
SEILLER WATERMAN LLC

Paul Joseph Hershberg
PAUL HERSHBERG LAW, PLLC

G. Eric Brunstad, Jr.
DECHERT LLP


COUNSEL FOR AMICUS CURIAE,
COMMUNITY CARE AND DEVELOPMENT
MANAGEMENT, INC.:

Douglas L. McSwain
Courtney Ross Samford
Thomas Travis
WYATT, TARRANT & COMBS, LLP

COUNSEL FOR AMICUS CURIAE,
THE COMMONWEALTH OF KENTUCKY,
EX REL. MATTHEW G. BEVIN, GOVERNOR:

Mark Stephen Pitt
Stephen Chad Meredith
Matthew  Kuhn
OFFICE OF THE GOVERNOR

COUNSEL FOR AMICUS CURIAE,
ROBERT STIVERS, PRESIDENT OF THE SENATE;
DAVID OSBORNE, SPEAKER PRO TEMPORE
OF THE HOUSE OF REPRESENTATIVES;
MORGAN MCGARVEY, SENATE MINORITY
FLOOR LEADER; AND ROCKY ADKINS, HOUSE
OF REPRESENTATIVES MINORITY FLOOR LEADER:

David E. Fleenor
General Counsel
OFFICE OF THE SENATE PRESIDENT

R. Vaughn Murphy
Deputy General Counsel
OFFICE OF THE SENATE PRESIDENT

Rebecca Rudd Barnes
OFFICE OF THE SENATE MINORITY FLOOR LEADER

Joanna Poole Decker
OFFICE OF THE HOUSE MINORITY FLOOR LEADER

Tyler Peavler
OFFICE OF THE SPEAKER OF THE HOUSE OF
REPRESENTATIVES


Deborah S. Hunt
Clerk of Court
UNITED STATES COURT OF APPEALS
SIXTH CIRCUIT

31