RENDERED: MARCH 14, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0478-DG

WALTER SWYERS                                                          APPELLANT

V.
ON REVIEW FROM COURT OF APPEALS
NO. 2020-CA-0322
JEFFERSON CIRCUIT COURT NO. 17-CI-001736

ALLEN FAMILY PARTNERSHIP #1, LLC,                              APPELLEES
INDIVIDUALLY AND DERIVATIVELY
ON BEHALF OF STATION PLACE LLC;
ALISA ALLEN NASH; CHERYL
MELINDA ALLEN; HYSINGER GROUP;
JAN ALLEN PFEIFER; PATRICIA GAIL
ALLEN; AND TYLER ALLEN

AND

2022-SC-0479-DG

HYSINGER GROUP                                                        APPELLANT

V.
ON REVIEW FROM COURT OF APPEALS
NO. 2020-CA-0322
JEFFERSON CIRCUIT COURT NO. 17-CI-001736

ALLEN FAMILY PARTNERSHIP #1, LLC,                              APPELLEES
INDIVIDUALLY AND DERIVATIVELY
ON BEHALF OF STATION PLACE LLC;
ALISA ALLEN NASH; CHERYL
MELINDA ALLEN; JAN ALLEN
PFEIFER; PATRICIA GAIL ALLEN;
TYLER ALLEN; AND WALTER SWYERS

**OPINION OF THE COURT BY JUSTICE BISIG**

**REVERSING**

A fundamental tenet of contract law is that a written agreement must be construed to effectuate the intentions of the parties as set forth in the plain language of their writing. The issue we decide in this case is whether the trial court erred in its interpretation of an agreement for distribution of proceeds from a sale of commercial real estate. In the spirit of the aphorism "no good deed goes unpunished," the agreement and ensuing dispute at issue arose as a result of one business partner asking his fellow business partners to sell him their interests to avoid a tax problem for his children.

The Court of Appeals disagreed not only with the trial court's interpretation of the contract, but also with the interpretation agreed upon by the parties to the contract themselves. We hold the trial court correctly construed the contract and therefore reverse the Court of Appeals.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 1998, Louisville area friends Nolen Allen, Walt Swyers, and Bill Hysinger formed an Indiana limited liability company, Station Place LLC, to purchase and manage a commercial building in downtown Indianapolis, Indiana. Each held an equal one-third interest in the LLC.[1]

---

[1] More precisely, Swyers held his one-third interest individually, while Allen's interest was held in Allen Family Partnership #1, LLC and Hysinger's in Hysinger Group, LLC. As discussed in further detail below, Allen's children also later gained interests in Station Place LLC. However, for ease of reference throughout this Opinion we shall use "Allen" to refer to Allen himself (either alone or collectively with Allen Family Partnership #1, LLC), the "Allens" to refer to Allen together with his children and the Allen Family Partnership #1, LLC, "Hysinger" to refer to Hysinger himself

2

In 2005, Allen and his children faced a tax problem that could be resolved by a like-kind exchange of property. Allen therefore asked Swyers and Hysinger to sell the majority of their interests in Station Place LLC to Allen's children for purposes of the like-kind exchange. Swyers and Hysinger agreed and each sold a 30% interest to Allen's children. The parties valued the building at $8 million for purposes of the transaction, and Hysinger and Swyers thus each received a payment of $1,049,000.[2] The result of this transaction was that the Allens now collectively held a 93.4% interest in Station Place LLC, while Swyers and Hysinger each retained a 3.3% interest.

Though not reduced to writing, the parties agreed in principle at the time of this 2005 transaction that when the building was sold in the future, proceeds below $8 million would be split according to the parties' ownership interests in the LLC, while proceeds above $8 million would be split one-third each between Allen, Swyers, and Hysinger. As the Allens acknowledge in their briefing to this Court, "[t]he apparent rationale was that the parties wanted to ensure Swyers and Hysinger would not forfeit potential future profit from a net sale above $8,000,000.00 as a result of the like-kind exchange."

In 2007, Swyers drafted a Memorandum regarding distribution of proceeds from a future sale of the building. This 2007 Memorandum set forth

---

(either alone or collectively with the Hysinger Group, LLC), and "Swyers" to refer to Swyers himself.

[2] An approximately $4.5 million mortgage existed on the building at the time of the 2005 transaction. Presumably, the $1,049,000 payments to Hysinger and Swyers were 30% of the $8 million building value, minus the then-existing mortgage.

3

two possible scenarios.  The first scenario involved a sale of the building for $9 million before the mortgage could be fully paid without incurring an approximately $1 million early payment penalty.  Under this scenario, total cash received from the sale would be around $3.5 million, which Swyers wrote the three would split according to their ownership interests in the LLC.  The second scenario involved a sale of the building for $9 million after the date on which the mortgage could be fully paid without penalty.  Under this scenario, Swyers noted the three men would avoid paying the approximately $1 million early payment penalty and thus could split that money one-third each between themselves, "unless it is reduced by a commission on the sale."  Swyers and Allen signed this 2007 Memorandum, but it does not bear a signature by Hysinger.

In 2010, Swyers drafted another Memorandum, this time signed by himself, Allen, and Hysinger.  In it, Swyers first recited that the purpose of the Memorandum was "to confirm our understanding with respect to the distribution of net proceeds from the sale of Station Place office building." Swyers then noted that the parties agreed at the time of the 2005 transaction that "upon ultimate sale of the property, . . . the Allen interest, Hysinger and Swyers would share proceeds above $8,000,000.00 on a one-third each basis." Swyers next recited that the 2007 Memorandum "confirmed" that 2005 agreement in writing.  Finally, the 2010 Memorandum concluded with the following specific terms for a distribution of proceeds from sale of the building:

[T]he distribution of net proceeds are agreed to be as follows:

4

1.  A sale up to $8,000,000.00 shall be distributed 33.34% to Allen Family Partnership #1 Ltd; 60% to the Nolen C. Allen family members (12% each) and 3.3% each to Hysinger Group, LLC and Walter J. Swyers, Jr.

2.  If the ultimate net sale price is in excess of $8,000,000.00, Hysinger, Swyers and Allen Family Partnership #1 Ltd shall each be entitled to one-third of net proceeds of the sale in excess of $8,000,000.00.

Station Place sold the building in January 2017 for $10 million. The Master Settlement Statement for the sale identified a number of seller expenses incurred by Station Place, including satisfaction of the remaining mortgage of approximately $4 million, a $300,000 sales commission, and various other expenses such as rent adjustments, warehouse fees, taxes, utilities, and repair credits. After satisfaction of all the listed expenses, the total amount of cash received by Station Place on the sale was approximately $4.6 million.

Swyers decided to distribute the sale proceeds in accordance with the bifurcated distribution formula set forth in the 2010 Memorandum. That is, he first reduced the initial $8 million of the sale price by the $4,048,272.25 in outstanding mortgages, and calculated distribution of the resulting figure according to the parties' ownership interests in the LLC. As for the remaining $2 million of the sale price, Swyers first deducted the $300,000 sales commission (but none of the other Master Settlement Statement seller expenses), and calculated distribution of the remaining $1.7 million equally, one-third each, between himself, Hysinger, and Allen. Swyers then made the

5

calculated distributions to the Allens, as well as distributions to himself and Hysinger of $594,695.00 each.[3]

In April 2017, the Allens sued Sywers and Hysinger in Jefferson Circuit Court, stating claims for a declaration of rights, breach of fiduciary duty, breach of the Station Place LLC Operating Agreement, and an accounting. The fundamental basis of the Allens' claims was that Swyers should have distributed the entirety of the sale proceeds according to the parties' ownership interests in the LLC, and that in failing to do so he overpaid himself and Hysinger. Swyers and Hysinger filed counterclaims asserting the 2007 and 2010 Memoranda were enforceable and applicable, that Swyers properly made the distributions pursuant to the terms of those Memoranda, and on that basis stating claims for a declaration of rights, breach of the Memoranda, disgorgement, and indemnification for attorney's fees and costs.

The Allens argued the 2007 and 2010 Memoranda were unenforceable and did not govern the transaction. The trial court disagreed and granted summary judgment in favor of Swyers and Hysinger, finding that the 2010 Memorandum governed distribution of the sale proceeds and thus Swyers had in fact underpaid himself and Hysinger by $103,564.19 each. The trial court therefore dismissed all of the Allens' claims other than the accounting claim.

The trial court then held a bench trial to determine whether it had correctly calculated the additional amounts Swyers and Hysinger were entitled

---

[3] Under Swyers' calculations, he and Hysinger were entitled to distributions of $697,073.68 each. However, Swyers distributed less than this total amount to himself and Hysinger to ensure he did not overpay.

6

to receive and to adjudicate Swyers' indemnification claim. After the bench trial, the trial court confirmed that Swyers and Hysinger were entitled to receive an additional $103,564.19 each.[4] The trial court also awarded Swyers indemnification of costs and attorney's fees in the amount of $560,471.52.

The Allens appealed. Before the Court of Appeals, the Allens did not challenge the trial court's finding that the 2010 Memorandum was enforceable and governed distribution of the sale proceeds. Rather, the Allens argued that under the 2010 Memorandum's bifurcated distribution formula, Swyers was required to distribute "net proceeds" from the sale and thus should have deducted not only the $300,000 sales commission, but also other seller expenses identified on the Master Settlement Statement, before calculating distribution of the final $2 million in sale proceeds. Swyers and Hysinger argued Swyers properly applied the bifurcated distribution formula when he deducted only the sales commission before calculating distribution of the final $2 million.

Though all parties to the 2010 Memorandum thus argued to the Court of Appeals that the Memorandum set forth a bifurcated distribution formula with an $8 million *sale price* threshold, the Court of Appeals rejected that interpretation. Instead, the Court of Appeals concluded that the plain language of the 2010 Memorandum set forth a bifurcation distribution formula

---

[4] While Station Place LLC received only approximately $4.6 million in cash from the sale of the building, the trial court's calculations result in a total distribution of approximately $5.6 million. The Allens argue this discrepancy is indicative of the erroneous nature of the trial court's ruling, while Swyers contends the additional amounts should properly be taken from the LLC's cash accounts.

with an $8 million *cash received* threshold. That is, the Court of Appeals concluded that distributions of one-third each to Allen, Swyers, and Hysinger were warranted only if the total "net proceeds" on the sale, construed by the Court of Appeals to mean the actual amount of *cash received* on the sale by the LLC, exceeded $8 million. The Court of Appeals thus held that because the total cash received from the sale could not have exceeded $5.6 million, Swyers should have distributed the entirety of those proceeds according to the parties' ownership interest. The Court of Appeals further held Swyers was also required to deduct every seller expense identified on the Master Settlement Statement before calculating the amounts to be distributed. The Court of Appeals thus reversed the trial court and remanded for calculation of distributions consistent with its opinion, reinstated the Allens' non-accounting claims for further proceedings, and vacated Swyers' indemnification award.

Swyers and Hysinger appealed to this Court. We granted discretionary review and heard oral argument.

## ANALYSIS

Swyers and Hysinger argue on appeal that the trial court correctly construed the parties' agreement 1) to impose a bifurcated distribution formula with an $8 million sale price threshold, and 2) to require deduction of only the sales commission in calculating the "net proceeds" of the final $2 million of the sale price available for distribution. The Allens urge us to affirm the Court of Appeals, including its holdings that 1) the 2007 Memorandum is extrinsic evidence not properly considered as part of the parties' agreement, 2) the 2010

8

Memorandum's bifurcated distribution formula imposes an $8 million cash received threshold before coming into effect, and 3) all Master Settlement Statement seller expenses must be deducted before calculating distribution of the sale proceeds.

The interpretation and legal effect of a written contract presents a pure question of law, and we therefore review the decisions of the courts below *de novo*. *Ky. State Univ. v. Darwin Nat'l Assurance Co.*, 677 S.W.3d 294, 300 (Ky. 2023). The parties agree that Indiana law governs this dispute. As such, we apply Indiana law to substantive issues and Kentucky law to procedural matters. *See Aetna Freight Lines, Inc. v. R. C. Tway Co.*, 298 S.W.2d 293, 295 (Ky. 1956) ("Matters of procedure are determined by the law of the forum . . . ."). Before proceeding to consider the substantive issues however, we must first address the contention of Swyers and Hysinger that the Allens did not preserve their arguments regarding the 2010 Memorandum for our consideration.

## I. We May Consider The Allens' Arguments Regarding The 2010 Memorandum.

Before the trial court, the Allens argued that the Station Place LLC Operating Agreement rather than the 2010 Memorandum is the operative agreement governing distribution of the sale proceeds. Swyers and Hysinger assert the Allens therefore also did not argue for particular interpretations of the 2010 Memorandum before the trial court, and thus the Allens' arguments regarding construction of the 2010 Memorandum are not preserved and may not be considered on appeal. We disagree.

9

Under our preservation rules, this Court will not consider issues neither raised in nor decided by the trial court below. *Jackson v. Est. of Day*, 595 S.W.3d 117, 126 (Ky. 2020) ("An appellate court is without authority to review issues not raised in or decided by the trial court.") (quoting *Meyers v. Commonwealth*, 381 S.W.3d 280, 286 (Ky. 2012)). The critical inquiry in determining whether an issue is preserved for review is: "was the question fairly brought to the attention of the trial court." *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 331 (Ky. 2014). Where the parties have brought the issue to the attention of the trial court, we may treat it as preserved. *See Est. of Worrall v. J.P. Morgan Bank, N.A.*, 645 S.W.3d 441, 448 (Ky. 2022) (holding that parties' raising of release and indemnification issue during truncated hearing was sufficient to preserve the issue); *see also Smith's Adm'x v. Smith's Adm'r*, 306 Ky. 106, 206 S.W.2d 200, 202 (1947) ("[W]here a case has been tried as though the pleadings raised certain issues, this court will so consider it.").

Here, the record makes plain that the parties brought both the issue of whether the 2010 Memorandum is the operative agreement, and the meaning of that document's terms, to the attention of the trial court. Though the Allens contended distribution was governed by the Operating Agreement, Swyers and Hysinger filed a counterclaim that included a claim for a declaration that the 2010 Memorandum was valid, enforceable, and governed distribution of the sale proceeds. The Allens filed an answer denying those allegations. The trial court addressed the issue when it ultimately ruled the 2010 Memorandum was enforceable and applied to distribution of the sale proceeds. As such, the issue

10

of whether the 2010 Memorandum governed this dispute was fairly brought to the attention of the trial court—and indeed ruled upon by that court.[5]

At the bench trial, the parties also presented testimony regarding the appropriate calculations for distribution of the sale proceeds, including with specific reference to which of the Master Settlement Statement expenses should be deducted in determining the "net proceeds" available for distribution as that term was used in the 2010 Memorandum. In ruling as to the appropriate distribution of sale proceeds under the 2010 Memorandum, the trial court necessarily reached a conclusion regarding the meaning of "net proceeds" available for distribution, implicitly if not explicitly.[6] As such, it cannot be said that the issue of the applicability of the 2010 Memorandum to this dispute or the import of that agreement's terms for distribution of the sale proceeds were not fairly brought to the attention of the trial court. Accordingly, we may consider the Allens' arguments regarding the applicability and interpretation of the 2010 Memorandum.

---

[5] As noted above, the Allens on appeal have not challenged the trial court's ruling that the 2010 Memorandum governs distribution of the sale proceeds.

[6] Even if the trial court did not specifically consider the meaning of "net proceeds," we may affirm the trial court's judgment so long as the judgment is supported by the record, given that the parties presented evidence to the trial court regarding the Master Settlement Statement expenses that should be deducted to determine the "net proceeds" available for distribution. *Klein v. Flanery*, 439 S.W.3d 107, 122 (Ky. 2014) ("[A]n appellate court may affirm a trial court's judgment on a ground the trial court did not address, provided only that the alternative ground was brought to the trial court's attention and is otherwise supported by the record.").

11

## II. The 2010 Memorandum Incorporates The 2007 Memorandum And Thus Those Documents Together Constitute The Parties' Agreement For Distribution Of The Sale Proceeds.

Having determined that we may consider the Allens' arguments, we turn now to the substantive merits of this appeal. The first issue we confront is whether the 2007 Memorandum constitutes part of the parties' agreement for distribution of sale proceeds, or whether the 2010 Memorandum alone represents that agreement. We conclude that the 2010 Memorandum incorporates the 2007 Memorandum by reference, and thus the two Memoranda together constitute the parties' contract.

As noted above, the parties agree that Indiana law controls. Under Indiana law, a contract incorporates another writing by including "a clear and explicit expression of intent to be bound by the auxiliary content." *Care Grp. Heart Hosp. v. Sawyer*, 93 N.E.3d 745, 754-55 (Ind. 2018). Where this occurs, the incorporated writing becomes part of the agreement. *Id.* at 754.

Here, the 2010 Memorandum explains the parties agreed at the time of the 2005 transaction that "upon ultimate sale of the property, . . . the Allen interest, Hysinger and Swyers would share proceeds above $8,000,000.00 on a one-third each basis." The 2010 Memorandum then refers to the 2007 Memorandum as having "confirmed" that agreement, and similarly states that the purpose of the 2010 Memorandum itself is "to confirm our understanding with respect to the distribution" of the sale proceeds. As this explicit language makes plain, the clear intent of the parties was for the 2010 Memorandum to "confirm" the agreement they reached at the time of the 2005 transaction, as

12

reduced to writing in the 2007 Memorandum. The 2010 Memorandum includes no language suggesting the parties intended it to wholly replace the 2007 Memorandum. Rather, the repeated use of the word "confirm" clearly and explicitly demonstrates an intent for the 2010 Memorandum to reaffirm and supplement the prior existing 2007 Memorandum. In other words, the parties clearly and explicitly expressed their intention for the 2007 Memorandum to constitute part of their agreement for distribution of the sale proceeds. Thus, because the 2010 Memorandum incorporated the 2007 Memorandum by reference, we conclude the two documents together form the parties' agreement.

### III. The Trial Court Correctly Applied The Bifurcated Distribution Formula Set Forth In The 2010 Memorandum.

Swyers and Hysinger next argue the trial court correctly determined the parties agreed to split sale proceeds on a bifurcated basis above and below an $8 million *sale price* threshold, and that the Court of Appeals erred in interpreting the parties' agreement to require an $8 million *cash received* threshold. We agree.

Like Kentucky law, Indiana law "defend[s] the freedom of contract by enforcing parties' agreed terms." *Id.* at 758. Under Indiana law, the

> goal in contract interpretation is to determine the intent of the parties at the time that they made the agreement. We start with the contract language to determine whether it is ambiguous. If the language is unambiguous, we give it its plain and ordinary meaning in view of the whole contract, without substitution or addition.

13

*Id.* at 752 (citations and quotations omitted). The meaning of a contract is determined "by considering all of its provisions, not individual words, phrases, or paragraphs read alone." *Id.* at 756.

The trial court determined that under the 2010 Memorandum, distribution of the first $8 million of the $10 million sale price should be calculated by first deducting the total of the remaining mortgages from $8 million, then distributing the resulting figure according to the parties' ownership interests in Station Place LLC. The trial court determined that distribution of the remaining $2 million of sale price should be calculated by deducting the $300,000 sales commission from that $2 million, and distributing the resulting figure one-third each to Allen, Swyers, and Hysinger.

The trial court's conclusion was consistent with the plain language of the 2007 and 2010 Memoranda, both of which place pronounced emphasis on an $8 million value or sale price of the building in determining distribution of the sale proceeds. For example, the 2007 Memorandum explicitly states the parties agree to share "1/3 each of any proceeds above" the $8 million "price" placed on the building at the time of the 2005 transaction. The 2010 Memorandum is the same, again referring to the $8 million "value" placed on the building at the time of the 2005 transaction and the parties' agreement to "share proceeds above" this $8 million threshold "on a one-third each basis." Finally, the 2010 Memorandum's formula for distribution of sale proceeds again refers to an $8 million "sale" and "sale price" as the threshold for application of the bifurcated distribution formula:

14

1. A *sale* up to $8,000,000.00 shall be distributed 33.34% to Allen Family Partnership #1 Ltd; 60% to the Nolen C. Allen family members (12% each) and 3.3% each to Hysinger Group, LLC and Walter J. Swyers, Jr.

2. If the ultimate net *sale price* is in excess of $8,000,000.00, Hysinger, Swyers and Allen Family Partnership #1 Ltd shall each be entitled to one-third of net proceeds of the sale in excess of $8,000,000.00.

(Emphasis added). The plain language of these Memoranda clearly expresses the parties' intent to split proceeds on a sale of the building in a bifurcated manner, such that proceeds on the first $8 million of the *sale price* would be split based on ownership interest, while anything above an $8 million *sale price* would be split on a one-third each basis.

Unsurprisingly, given this plain language, all parties to the agreement argued before the Court of Appeals that the sale price was the relevant threshold, though they disagreed in the calculations flowing from that interpretation. Yet the Court of Appeals rejected the parties' agreed interpretation of their own agreement as setting forth a sale price threshold, narrowly focusing instead on the 2010 Memorandum's reference to distribution of "one-third of *net proceeds* of the sale in excess of" $8 million. (Emphasis added). The Court of Appeals took this language to mean the parties could only distribute sale proceeds on a one-third each basis if the net proceeds— which the Court of Appeals took to mean total cash actually received by the LLC from the sale—exceeded $8 million. Thus, because the cash received on the sale could equal at most only approximately $5.6 million, the Court of

15

Appeals concluded the entirety of the sale proceeds must be distributed according to the parties' ownership interests.[7]

With this narrow interpretation we cannot agree. First, as noted above, Indiana law requires that a contract be interpreted "by considering all of its provisions, not individual words, phrases, or paragraphs read alone." *Care Grp. Heart Hosp.*, 93 N.E.3d at 756. The Court of Appeals' limited focus on the 2010 Memorandum's use of the term "net proceeds" disregarded wholesale the numerous other references in the Memoranda to an $8 million *sale price* or *value* threshold for application of the bifurcated distribution formula. When the Memoranda are considered together and as a whole, rather than with unduly pronounced emphasis on the phrase "net proceeds," the evident intent of the parties was to split proceeds on the portion of the sale price below $8 million according to ownership interest, and above $8 million on a one-third each basis.

Second, and in any event, the evident import of the phrase "net proceeds" as used by the parties is not "cash received." If "net proceeds" as used in the agreement meant "cash received," it would be difficult to harmonize with the parties' numerous other references to value and sale price as the relevant threshold for application of the bifurcated distribution formula. However, "net proceeds" as used in the 2010 Memorandum can easily be harmonized with a value or sale price threshold if "net proceeds" simply refers to the amount of

---

[7] Though not argued by them to the Court of Appeals, the Allens now urge us to accept the Court of Appeals' interpretation as correct.

the sale price remaining after required deductions of seller expenses, such as the mortgage and sales commission. Indeed, the Memoranda plainly contemplate deduction of the mortgages and sales commission before calculation of the distributions. Thus, even when considered in isolation, "net proceeds" simply refers to a reduction of the sale price by deductible seller expenses, rather than cash received.

Finally, Indiana law also provides that a court's

objective in interpreting a contract is to ascertain the meaning and intent of the parties as expressed in the language used. In determining the intention of the parties, *a contract should be considered in the light of the surrounding circumstances existing at the time it was made.* The court should consider the nature of the agreement, together with all the facts and circumstances leading up to the execution of the contract, the relation of the parties, the nature and situation of the subject matter, *and the apparent purpose of making the contract.*

*Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 309 (Ind. 2012) (citations and quotations omitted) (emphasis added). Here, the parties' agreement regarding distribution of proceeds from a future sale of the building arose in the context of Allen asking his friends Swyers and Hysinger to help him avoid a tax problem. In particular, Allen asked the men to sell their interests in the LLC to his children, and they agreed. While Swyers and Hysinger were thus willing to help Allen, they did not wish to forgo the future profits they would have received on a future sale of the building had they chosen instead to retain their interests in the LLC instead of selling them to help Allen. Thus, as aptly stated by the Allens themselves in their briefing to this Court, the "apparent rationale" of the agreement "was that the parties wanted to ensure Swyers and

17

Hysinger would not forfeit potential future profit from a net sale above $8,000,000.00 as a result of" helping their friend Allen with his tax problem.[8]

Given that the plain purpose of the parties' agreement was to preserve the ability of Swyers and Hysinger to retain their share of future profits above the then-estimated $8 million *value* placed on the building, it makes little sense to conclude the parties nonetheless intended to impose an $8 million *cash received* threshold before Swyers and Hysinger would be entitled to a one-third share each. And of course, it makes great sense to have set an $8 million *sale price* threshold above which they would each receive a one-third share, given that the building was valued at $8 million at the time they sold their interests. Thus, not only does the plain language of the Memoranda support the trial court's decision, so too does the evident context, circumstances, and purposes underlying the parties' agreement. As such, we have little trouble concluding the trial court correctly applied the bifurcated distribution formula on the basis of an $8 million *sale price* threshold, and the Court of Appeals erred in its overly narrow conclusion that the agreement imposed an $8 million *cash received* threshold before Swyers and Hysinger would be entitled to their fair one-third share each.

---

[8] But as noted above, no good deed goes unpunished. Despite benefitting from the willingness of Swyers and Hysinger to help Allen by selling their interests in the LLC in 2005, the Allens now urge that Swyers and Hysinger are each entitled to only a 3.3% share each of the entirety of the sale proceeds.

## IV. The Parties' Agreement Requires Deduction Only Of The Sales Commission In Calculating Distribution Of The Final $2 Million Of The Sale Price.

Having determined that the parties' bifurcated distribution formula sets forth an $8 million sale price threshold, we now must consider what seller expenses identified on the Master Settlement Statement must be deducted before distribution of the final $2 million of the sale price. Though the 2010 Memorandum is silent on the issue, the 2007 Memorandum provides an answer. That writing states that the one-third share distributions would be "reduced by a commission on the sale," without identification of any other seller expenses to be deducted before calculating those distributions. Had the parties wished to deduct other seller expenses, they could have said so but did not. Thus, because the plain language of the Memoranda allows only for deduction of the sales commission, Swyers was not required to deduct other seller expenses in calculating distributions of the one-third shares. *See Care Grp. Heart Hosp.*, 93 N.E.3d at 756 ("If the parties had intended that result, they could have said so. They did not, and we will not add tacit terms into the parties' express, agreed-upon ones.") (citation omitted).

So where does that leave us? In sum, the trial court correctly determined the parties' agreement required application of an $8 million sale price threshold to the bifurcated distribution formula, and correctly determined that only the sales commission should be deducted before calculating distribution of the excess $2 million in sale proceeds. The Court of Appeals erred in reversing the trial court's decision, both insofar as the Court of

19

Appeals found the bifurcation distribution formula required an $8 million cash received threshold and found that all seller expenses identified on the Master Settlement Statement must be deducted before distribution. As such, we conclude the trial court correctly granted judgment in favor of Swyers and Hysinger, correctly dismissed the Allens' non-accounting claims, and correctly awarded indemnification to Swyers.

That said, we note that the trial court's final judgment reflects a purely mathematical error. Subtraction of the $4,048,272.25 in mortgages from the first $8 million of the sale price results in an amount for distribution of $3,951,727.75. The trial court erroneously calculated the difference as $3,981,727.75, and thus also erroneously concluded the 3.3% share each due to Swyers and Hysinger is $131,592.53. In fact, Swyers and Hysinger are each entitled to receive $130,407.02 from the first $8 million of the sale price. Each is also entitled to a one-third share of the remaining $2 million of the sale price, less the $300,000 sales commission, or $566,666.67 each. Thus, Swyers and Hysinger were entitled to a total distribution of $697,073.69. Having received thus far only distributions of $594,695.00 each, Swyers and Hysinger are therefore entitled to judgment for additional distributions of $102,378.69 each. We leave undisturbed the trial court's awards of indemnification and pre- and post-judgment interest.

**CONCLUSION**

For the foregoing reasons, we reverse the Court of Appeals and affirm the trial court's conclusions that the parties' agreement required application of an

20

$8 million sale price threshold to the bifurcated distribution formula, and that only the sales commission should be deducted before calculating distribution of the excess $2 million in sale proceeds. However, because the trial court's judgment included a purely mathematical error, we vacate that judgment and remand for entry of a mathematically accurate judgment consistent with this Opinion.

VanMeter, C.J.; Bisig, Conley, Keller, Nickell, and Lambert, JJ., sitting. All concur. Thompson, J., not sitting.

COUNSEL FOR APPELLANT/APPELLEE, WALTER SWYERS:

William F. McMurry
Rhys Cundiff
William F. McMurry & Associates

COUNSEL FOR APPELLANT/APPELLEE, HYSINGER GROUP:

W. Edward Skees
The Skees Law Office

COUNSEL FOR APPELLEE:, ALLEN FAMILY PARTNERSHIP #1, LLC, INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF STATION PLACE LLC; ALISA ALLEN NASH; CHERYL MELINDA ALLEN; JAN ALLEN PFEIFER; PATRICIA GAIL ALLEN; TYLER ALLEN:

Christopher E. Schaefer
Emily E. Mattingly
Stoll Keenon Ogden PLLC

21